In the Matter of the Application for the Revocation of Ancillary Letters Testamentary of the Estate of JOSEPHINE L. NEWCOMB, Deceased.

WILLIAM H. HENDERSON et al., Appellants; BRANDT V. B. DIXON, Respondent.

1. DOMICILE — WORDS "DOMICILE" AND "RESIDENCE" RELATING TO SUCCESSION, EITHER BY WILL OR INTESTACY, DEFINED AND DISTINGUISHED. While the words "domicile" and "residence" relating to succession, either by will or intestacy, are frequently used, even in statutes, as if they had the same meaning, they are not identical terms, since a person may have two or more places of residence, but only one domicile. Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place and also an intention to make it one's domicile.

2. SAME — CONTINUANCE AND CHANGE OF DOMICILE — MAY BE CHANGED AT WILL. An existing domicile, whether of origin or selection, continues until a new one is acquired; but it may be changed at will by any person of full age and sound mind who is not under restraint, unless it may be that the domicile of a wife is controlled by that of her husband so long as she lives with him. Subject to the qualifications named every human being may select and make his own domicile, but the selection must be followed by proper action.

3. SAME — CHANGE OF DOMICILE — QUESTION OF FACT — BURDEN OF PROOF — EVIDENCE. The question whether a domicile has been changed is one of fact rather than of law, and the burden of proof rests upon the party who alleges a change. In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence is of no avail. Mere change of residence although continued for a long time does not effect a change of domicile, while a change of residence even for a short time with the intention in good faith to change the domicile, has that effect. Residence is necessary, for there can be no domicile without it, and important as evidence, for it bears strongly upon intention, but not controlling, for unless combined with intention it cannot effect a change of domicile; but there must be a present, definite and honest purpose to give up the old and take up the new place as the domicile of the person whose status is under consideration.

4. SAME — MOTIVES ACTUATING CHANGE OF DOMICILE — IMMATERIAL, EXCEPT AS THEY INDICATE INTENTION. The motives actuating a change of domicile are immaterial, except as they indicate intention. A change of domicile may be made through caprice, whim or fancy, for business,

health or pleasure, to secure a change of climate, or a change of laws, or for any reason whatever, provided there is an absolute and fixed intention to abandon one and acquire another and the acts of the person affected confirm the intention

5. SAME — WHEN ABSENCE FROM NEW DOMICILE NOT EVIDENCE OF CHANGE THEREOF. When a new domicile has been actually acquired it does not necessarily revert, even if not followed by continuous residence. There may be many absences from the new place and protracted sojournings in the old, unless intention and residence unite again, when still another change of domicile is effected.

6. SAME — DECLARATIONS OF CHANGE OF RESIDENCE — WHEN COMPETENT EVIDENCE. While intention may be proved by acts and by declarations connected with acts, yet it is not thus limited when it relates to mental attitude or to a subject governed by choice. The right to choose a residence implies the right to declare one's choice thereof, formally or as he prefers, and even for the sole purpose of making evidence to prove what his choice was. Such declarations are not self-serving in an improper sense, unless they are made with intent to deceive. If they are false and made for a sinister purpose, they will meet the fate that falsehood always meets in courts of justice when discovered by the triers of fact.

7. SAME — WRITTEN DECLARATIONS OF CHANGE OF RESIDENCE BY TESTATRIX — WHEN PROPERLY ADMITTED IN EVIDENCE. Where, therefore, in a proceeding to vacate ancillary letters testamentary issued to executors appointed under a will admitted to probate in the state of Louisiana, the principal question litigated was whether the testatrix, at the time of her death, resided and had her domicile in the city of New York or in the city of New Orleans, evidence of express declarations made in writing by testatrix about three years before her death, and sent by her to relatives and business agents, to the effect that she had elected to make the city of New Orleans her place of domicile and permanent home, were competent and admissible evidence, and an objection thereto upon the ground that the declarations of the decedent relating to her domicile, whether verbal or written, not made in connection with acts done by her, or in explanation thereof, were self-serving and inadmissible was properly overruled.

8. EVIDENCE — CODE CIV. PRO. § 834 — WHEN ATTENDING PHYSICIAN PROHIBITED FROM ANSWERING GENERAL QUESTIONS RELATING TO PHYSICAL CONDITION OF A DECEDENT. Where general questions as to the health and physical condition of such testatrix, intended to show that she was not prevented by sickness from returning to New Orleans during certain years, were asked her attending physician without any attempt to limit the answers of the witness to what he had observed when not in attendance upon her as a physician and the answers might have involved the disclosure of information acquired by the witness in a professional capacity and necessary to enable him to act in that capacity, such ques-

tions were within the spirit of the prohibition of section 834 of the Code of Civil Procedure, and were properly excluded under an objection that the questions called for "answers of the witness as her attending physician."

9. EVIDENCE — ERRONEOUS EXCLUSION THEREOF — WHEN DECREE OF SURROGATE SHOULD NOT BE REVERSED FOR POSSIBLE ERROR IN EXCLUSION OF EVIDENCE — CODE CIV. PRO. § 2545. Assuming that the rulings, excluding the testimony of the attending physician of testatrix, were erroneous, they do not require a reversal of the surrogate's order denying the application to vacate the ancillary letters testamentary, because the appellants were not necessarily prejudiced thereby, since it is apparent from an examination of the evidence that the same conclusion would have been reached even if the witness had stated that the physical condition of testatrix did not prevent her from going to New Orleans in the years in question. Under the statute (Code Civ. Pro. § 2545), a decree or order of the Surrogate's Court should not be reversed "for an error in admitting or rejecting evidence, unless it appears to the appellate court that the exceptant was necessarily prejudiced thereby."

*Matter of Newcomb*, 122 App. Div. 920, affirmed.

(Argued April 2, 1908; decided May 19, 1908.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered December 20, 1907, which affirmed a decree of the New York County Surrogate's Court dismissing an application for the revocation of ancillary letters testamentary.

Josephine Louise Newcomb died in the city of New York on the 7th of April, 1901, at the age of eighty-five, leaving an estate worth more than $2,000,000 and an instrument purporting to be her holographic will, executed at the city of New Orleans on the 12th of May, 1898, of which the material part is as follows :

" *First*. I have resided of late years in different places, but have made the City of New Orleans my permanent home, because I here witness and enjoy the growth of the ' H. Sophie Newcomb Memorial College,' a department of the Tulane University of Louisiana which I have founded, and has been named in honor of the memory of my beloved daughter.

· " I have implicit confidence that the 'Administrators of the Tulane Educational Fund' will continue to use and apply the benefactions and property I have bestowed and may give for the present and future development of this department of the

University known as the H. Sophie Newcomb Memorial College which engrosses my thoughts and purposes, and is endeared to me by such hallowed associations.

"*Second.* I have no forced heirs, I owe no debts; and I hereby revoke all wills of a date anterior to this.

"I hereby make the following special legacies and bequests:

"To the Greenwood Cemetery a corporation organized and existing under and by virtue of Chapter 298 of the laws of the State of New York passed in 1838, the sum of Two thousand ($2,000) dollars for the care of lots numbered 17,036 and 17,037 and it is my desire, that at my death, my remains may be placed with the loved ones there at rest.

"To Alice Bowman of New Orleans Louisiana five thousand ($5,000) Dollars.

"To William Robertson of Charleston South Carolina one thousand ($1,000) Dollars.

"*Third.* With the exception of the special legacies and bequests herein above stated and made, I hereby give and bequeath to the 'Administrators of the Tulane Educational Fund' of New Orleans, the whole of the property, real, personal and mixed of which I am now possessed or which I may leave at the time of my death, and to that end and purpose I do hereby name and constitute the said 'Administrators of the Tulane Educational Fund' to be my universal legatee.

"I appoint my cousin and friend Joseph A. Hincks and my friend B. V. B. Dixon to be Executors giving them seizin and detainer of my estate and requiring no bond from them.

"Thus wholly have I written dated and signed this my last will and testament at New Orleans Louisiana this 12th day of May, 1898."

On the 8th of April, 1901, the day after Mrs. Newcomb died, this instrument was admitted to probate as her last will and testament in the Civil District Court for the parish of Orleans in the state of Louisiana, without notice to her heirs at law or next of kin and letters testamentary were issued to the executors named therein, both of whom promptly qualified. On the 13th of April, 1901, upon their petition, ancil-

16

lary letters testamentary were issued to said executors by the Surrogate's Court of the county of New York, without notice to any one, but the comptroller of the state voluntarily appeared and waiving notice consented that ancillary letters should be issued.    The executors forthwith removed the bulk of the assets belonging to the estate from the state of New York to the state of Louisiana.    About one year later, or on the 14th of April, 1902, the heirs at law and next of kin of Mrs. Newcomb, being nephews and nieces and grand nephews and nieces, four of whom resided in Louisville, Ky., and two in New Orleans, upon their petition setting forth facts tending to show that the decedent resided in the city of New York at the date of her death ; that she was not of sound mind ; that she was subject to undue influence when she signed said instrument, and that a holographic will cannot be set aside on account of undue influence in the state of Louisiana, procured an order from the Surrogate's Court of the county of New York requiring the executors to show cause why the ancillary letters testamentary should not be revoked and vacated.    A citation was issued and in due course of procedure an answer was filed by one of the executors, raising, among other issues, the question whether Mrs. Newcomb, at the time of her death, resided and had her domicile in the city of New York or in the city of New Orleans. On the 16th of July, 1902, Robert E. Deyo, Esq., was appointed referee to hear the evidence relating to said issue and report the same with his opinion.    A long trial followed and much evidence was taken, both oral and written, which appears in four large printed volumes now before the court. Between seven and eight hundred requests to find were presented to the referee and the surrogate, all of which were duly passed upon, and exceptions were filed by the respective parties to such findings as they considered unwarranted by the evidence or by law.

The referee, in his report dated March 27th, 1905, found "That the residence or domicile of Josephine Louise Newcomb, deceased, at the time of her death, was in the city of New Orleans, in the state of Louisiana."    The surrogate con-

firmed all the findings of fact and law made by the referee, adopted his opinion and also found specifically " That Josephine Louise Newcomb, the decedent, was, prior to and at all times since the death of her husband and daughter down to the time of her own death, in all respects, competent to select, change, acquire and establish a legal and valid domicile or residence; that previously to the time of her death the said Josephine Louise Newcomb had voluntarily and without compulsion or restraint exercised upon her, selected and adopted the city of New Orleans, in the State of Louisiana, as her domicile and place of permanent abode and residence, and continued to there reside and have her domicile and permanent place of residence and abode down to and at the time of her death." He dismissed the application for the revocation of ancillary letters testamentary and a decree was entered accordingly. On appeal by the petitioners to the Appellate Division the decree was unanimously affirmed and thereupon they appealed to this court.

*Austen G. Fox, F. A. Gaynor* and *Philip A. Rollins* for appellants. Reversible error was committed in the exclusion of testimony. (*Clifford* v. *D. R. G. R. R. Co.*, 188 N. Y. 349; *Schlotter* v. *B. & N. Y. F. Co.*, 89 App. Div. 508; *People* v. *Schuyler*, 106 N. Y. 298; *Griffith* v. *M. S. R. Co.*, 171 N. Y. 106; *Green* v. *M. S. Ry. Co.*, 171 N. Y. 204; *Meyer* v. *S. L. & A. Co.*, 8 App. Div. 74; *Powers* v. *M. S. R. Co.*, 105 App. Div. 358; *Matter of Halsey*, 29 N. Y. S. R. 587, 591; *Griebel* v. *B. H. R. R. Co.*, 68 App. Div. 204; *Matter of Freeman*, 46 Hun, 458.) The court erred in receiving the formal declarations as to domicile subscribed by Mrs. Newcomb, because they were made for the purpose of making evidence in this case and not to indicate that her true intention was from the date of the declaration to live in New Orleans as her home or domicile, and thereby change her New York county domicile. The declarations were self-serving, and, therefore, inadmissible. (*Viles* v. *Waltham*, 157 Mass. 542; *Watson* v. *Simpson*, 13 La. Ann. 337; *Ayer* v. *Weeks*,

65 N. H. 248; *Fulham* v. *Howe*, 62 Vt. 386; *Derby* v. *Salem*, 30 Vt. 722; *Hulett* v. *Hulett*, 37 Vt. 581; *Weld* v. *City of Boston*, 126 Mass. 166; *Wright* v. *City of Boston*, 126 Mass. 161; *Salem* v. *Lynn*, 13 Metc. 544; *Wayne* v. *Greene*, 21 Me. 357.)

*James McConnell* and *George F. Canfield* for respondent. The declarations of a person in regard to his domicile are material, relevant and competent, since the matter of domicile involves the intention of the person; and declarations, whether verbal or written, are always admissible as evidence of intention or other mental condition, although not accompanying an act or part of the *res gestæ* in the ordinary sense of the term. (Greenl. on Ev. [16th ed.] § 162c; *M. L. Ins. Co.* v. *Hillman*, 145 U. S. 285; *Matter of Roberts*, 8 Paige, 519; *Marx* v. *McGlynn*, 88 N. Y. 357; *Matter of Zerega's Will*, 21 N. Y. Supp. 117; *Isham* v. *Gibbons*, 1 Bradf. 69; *Cruger* v. *Phelps*, 21 Misc. Rep. 252; *Plant* v. *Harrison*, 36 Misc. Rep. 669; *Chambers* v. *Prince*, 75 Fed. Rep. 176; *The San Rafel*, 141 Fed. Rep. 279; *Shailer* v. *Burnstead*, 99 Mass. 120; *Kreitz* v. *Behrensmeyer*, 125 Ill. 197; *Comm.* v. *Tretham*, 147 Mass. 180.) Dr. Scratchley's opinion as to Mrs. Newcomb's condition, physical and mental, was properly excluded. (*Fisher* v. *Fisher*, 129 N. Y. 654; *Edington* v. *Ins. Co.*, 67 N. Y. 185; *Feeney* v. *R. R. Co.*, 116 N. Y. 375; *Matter of Darragh*, 52 Hun, 591; *Grattan* v. *M. L. Ins. Co.*, 80 N. Y. 297; *Clifford* v. *D. & R. G. R. R. Co.*, 188 N. Y. 349.) A decree or order of a Surrogate's Court cannot be reversed "for an error in admitting or rejecting evidence, unless it appears to the appellate court that the exceptant was necessarily prejudiced thereby." (Code Civ. Pro. § 2545; *Snyder* v. *Sherman*, 88 N. Y. 656; *Loder* v. *Whelpley*, 111 N. Y. 239; *Matter of Miner*, 146 N. Y. 121; *Roche* v. *Nason*, 185 N. Y. 128; *Matter of Crane*, 68 App. Div. 355; *Matter of Rice*, 81 App. Div. 223.)

VANN, J. While the rule of unanimous affirmance prevents us from reviewing the evidence, a more complete statement of

the leading facts found by the surrogate, in passing upon the requests presented by the parties, is necessary in order to properly discuss the rulings relating to evidence which it is our duty to review.

The decedent, Josephine Louise Newcomb, was born on the third of October, 1816, in the city of Baltimore, where her parents resided. She was of French extraction on the part of her father and English on the part of her mother. She was partially educated in Baltimore where she resided until the death of her mother in 1831 or 1837, both evidence and findings leaving the year in doubt. She then removed to New Orleans, Louisiana, where she finished her education and resided with Mrs. Henderson, her only sister, until her marriage there in 1845 to Warren Newcomb, a native of Massachusetts. After their marriage she and her husband went to Louisville, Kentucky, where he acquired a substantial estate and where they resided until 1862, when owing to the confusion caused by the Civil war they removed to the city of New York and resided at the Hoffman House until the death of Mr. Newcomb in 1866. He left him surviving Mrs. Josephine Louise Newcomb, his widow, and a daughter named Sophie, then about ten years of age. All his property, valued at about $500,000, passed by will to his widow and daughter. Mrs. Newcomb never had any child other than Sophie, except a son who lived but a short time. After the death of her husband she continued to reside with her daughter in the city of New York, living at hotels and boarding houses until December 16th, 1870, when Sophie died, and her mother inheriting from her, thereupon became possessed of the entire estate left by Mr. Newcomb.

The death of her daughter exerted a powerful influence upon the hopes and ambitions of Mrs. Newcomb's life. Shortly after that event she divided $150,000, which was from one-fifth to one-fourth of all her property at that time, among her nearest relatives, ancestors of the petitioners, and formed the plan of devoting the rest of her estate to some kind of a memorial to her daughter. The memorial

idea, vague at first, took more definite shape in 1886 when she founded the H. Sophie Newcomb Memorial College, an unincorporated branch of Tulane University in the city of New Orleans, and before her death in 1901 she had given about $1,000,000 to the university for the benefit of that college. Her fortune had increased, however, through the judicious management of her agents in New York, so that she left upwards of $2,000,000 when she died.

After the death of her daughter she continued to reside in the city of New York, not keeping house but boarding and spending the warm weather in various summer resorts in different states.   In 1871 she visited her sister in New Orleans for about one month, but after that she was not in the state of Louisiana again until 1892, when she made another visit of a few weeks, living at a boarding house.   She renewed her visit in 1893 for seven weeks, and in 1894 for nine weeks, staying with different friends.   In 1895 she made a will by which she left substantially all her property to the memorial college and in which she described herself as of Bayonne, New Jersey.   At about the same time she stated her residence in the same way in a conveyance of real estate, and also, in 1897, in a codicil ratifying her will.   In the spring of 1895 she lived for six weeks at the Josephine Louise House, a dormitory of the memorial college erected by her, and returning there on the 10th of December, 1895, she remained until April 30th, 1896, living all the time at the dormitory and taking her meals in the students' dining room, except as she was driven out by fire for a few weeks. After spending the summer in the Adirondacks she went to New Orleans in November, stopping at New York on her way, and lived at the Josephine Louise House until May 1897.   Again spending the summer at various resorts, and about two months in the fall at the Fifth Avenue Hotel, she returned to New Orleans and lived there as before from December 10th, 1897, until May 31st, 1898.

During this period, apprehending, with some reason, that any will she might make would be contested by her relatives

she took counsel as to what she should do in order to become a citizen of New Orleans, and also with reference to making her will so as " to secure the strength " of her fortune to the memorial college. After making a list of questions to ask relating to these subjects, she consulted Mr. McConnell, an able lawyer of New Orleans, the counsel of the university and one of its officers, who advised her to change her domicile, and that she could do so by making an express declaration in writing to that effect. He suggested a will written, dated and signed by her own hand, and offered to furnish her, and subsequently at her request did furnish her, a form both for the declaration as to residence and the making of the will.

On the 15th of April, 1898, knowing that she had declared herself a resident of New Jersey in several documents, acting under Mr. McConnell's advice and observing the form furnished by him, she executed at New Orleans certain formal declarations, in one of which she stated : " I have now concluded to make my permanent home here, because on each succeeding day of my life now drawing to a close, I am the grateful witness of the successful development and steady growth of this noble institution (referring to the Memorial College), which now engrosses my thoughts and purposes and is endeared to me by such hallowed associations. In order that there may be no occasion for misapprehension hereafter, especially in any matter touching the settlement of my estate, I desire to have it known by my particular friends that I have elected to make the city of New Orleans my place of domicile and permanent home, although of course I may occasionally visit or reside in other places." The other declarations contained similar statements. She sent these announcements to various persons, including Mr. Hinck, a relative and now one of her executors, and to Mr. Pomroy, her trusted business manager in New York. About one month later she made the will in question, written by her own hand, but according to the form furnished by Mr. McConnell.

She spent the summer of 1898 at watering places in the north and made preparations to go to New Orleans in the

fall, but owing to poor health she remained in New York city, spending the winter at the Fifth Avenue Hotel. In July, 1899, while she was at Richfield Springs, New York, acting through the president of a bank in New Orleans, but upon the advice of Mr. McConnell, she purchased a dwelling house in New Orleans for her own use, and paid therefor the sum of $14,000. It was situated near the university and is now a part of it. From January 21st until May 30th, 1900, she lived in that house but went north for the summer, expressing the intention of returning in the fall. She never returned. While making a visit at the house of a friend in New York on her way from Richfield Springs to New Orleans she was taken sick, and on the 7th of April, 1901, she died. The surrogate, adopting the findings of the referee, found that "subsequent to the spring of 1895 Mrs. Newcomb intended to return every year to New Orleans after spending the summer in the north, and did in fact return to New Orleans every year except when prevented by illness."

During the period of about four years preceding her formal declaration of domicile, she spent upwards of five hundred days in the city of New Orleans as compared with less than one hundred and fifty in the city of New York. Between the date of the declaration and the date of her death she spent less than two hundred days in New Orleans and more than six hundred in New York city. The rest of the time during both periods she spent at summer resorts in New York and New England. All her relatives and many of her intimate friends were southern people, and during the last years of her life she spoke and wrote of the south as her country and of New Orleans as her home. Upon the foundation of the memorial college her interest and affection were absorbed more and more by the memorial idea, which finally became her chief ambition and to a great extent took the place of her deceased husband and daughter. She spoke of it as her "life's work" and declared that "in this college my daughter lives again to me. She does not seem to be dead, but lives again in this college and in these girls."

During all these years her bank account was kept in the city of New York, her estate was managed there, and her only safe deposit box was there, except one in Jersey City during the last year of her life. She left some, but not much, of her clothing there, and her regular physician resided there. She had but few personal belongings, and carried the most of them with her in trunks. During a period of thirty years, and until she was about eighty years of age, her domicile was in the city of New York.

Both referee and surrogate found a multitude of incidental and evidentiary facts bearing in diverse ways upon the ultimate question of her domicile at death, some of which indicate that for many years and with a definite object in view, the authorities of Tulane University paid anxious and assiduous court to this old lady and her fortune. It was argued before the referee, and the argument was repeated before us, that she resided in New York and visited in New Orleans, instead of residing in New Orleans and visiting in New York; that her later visits south differed in no material respect from those made earlier, and that under the tuition of representatives of the university she sought to become a nominal resident of Louisiana merely for the purpose of making a will to accord with the laws of that state, and not for the purpose of making a permanent home there. These contentions are not open to us, for they are conclusively disposed of by the finding of the surrogate and the unanimous affirmance thereof by the Appellate Division, that the city of New Orleans was at the date of her death her actual and legal domicile. As it is not denied that the findings of the surrogate support his conclusions of law, the only questions calling for discussion are those raised by exceptions to rulings relating to evidence.

By appropriate exceptions the point is raised that the declarations of the decedent relating to her domicile, whether verbal or written, not made in connection with acts done by her, or in explanation thereof, were self-serving and inadmissible. This contention requires a consideration of the principles of law governing the subject of domicile, and in

discussing those principles we shall consider them simply with reference to the rules relating to succession, either by will or intestacy, as distinguished from those relating to attachments against the property of non-resident debtors, substituted service of process upon non-residents, matrimonial actions and the like.

As domicile and residence are usually in the same place, they are frequently used, even in our statutes, as if they had the same meaning, but they are not identical terms, for a person may have two places of residence, as in the city and country, but only one domicile. Residence means living in a particular locality, but domicile means living in that locality with intent to make it a fixed and permanent home. Residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place and also an intention to make it one's domicile.

The existing domicile, whether of origin or selection, continues until a new one is acquired and the burden of proof rests upon the party who alleges a change. The question is one of fact rather than law, and it frequently depends upon a variety of circumstances, which differ as widely as the peculiarities of individuals. Less evidence is required to establish a change of domicile from one state to another than from one nation to another. In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence is of no avail Mere change of residence although continued for a long time does not effect a change of domicile, while a change of residence even for a short time with the intention in good faith to change the domicile, has that effect. *Uno solo die constituitur domicilium si de voluntate appareat.* Residence is necessary, for there can be no domicile without it, and important as evidence, for it bears strongly upon intention, but not controlling, for unless combined with intention it cannot effect a change of domicile. (*Dupuy* v. *Wurtz,* 53 N. Y 556, 561; *The Venus,* 8 Cranch, 253, 278; *Carey's Appeal,* 75 Penn. St. 201, 205; Wharton's Conflict of Law

[2d ed.], §§ 21, 56, 66.)   There must be a present, definite and honest purpose to give up the old and take up the new place as the domicile of the person whose status is under consideration.   The subject is under the absolute control of every person of full age and sound mind who is free from restraint, unless it may be that the domicile of a wife is controlled by that of her husband as long as she lives with him.   (Story's Conflict of Law [7th ed.], § 46.)   Subject to the qualifications named every human being may select and make his own domicile, but the selection must be followed by proper action. Motives are immaterial, except as they indicate intention.   A change of domicile may be made through caprice, whim or fancy, for business, health or pleasure, to secure a change of climate, or a change of laws, or for any reason whatever, provided there is an absolute and fixed intention to abandon one and acquire another and the acts of the person affected confirm the intention.   (*McConnell* v. *Kelley*, 138 Mass. 372.)   No pretense or deception can be practiced, for the intention must be honest, the action genuine and the evidence to establish both, clear and convincing.   The *animus manendi* must be actual with no *animo revertendi.*   A temporary residence for a temporary purpose, with intent to return to the old home when that purpose has been accomplished, leaves the domicile unchanged, but even if the residence was begun for a temporary purpose, intention may convert it into a domicile.   When a new domicile has been actually acquired it does not necessarily revert, even if not followed by continuous residence.   There may be many absences from the new place and protracted sojournings in the old, unless intention and residence unite again, when still another change of domicile is effected.

This discussion shows what an important and essential bearing intention has upon domicile.   It is always a distinct and material fact to be established.   Intention may be proved by acts and by declarations connected with acts, but it is not thus limited when it relates to mental attitude or to a subject governed by choice.   As we have seen, a person may select

and make his own domicile and no one may let or hinder. He may elect between his winter and summer residence and make a domicile of either. The right to choose implies the right to declare one's choice, formally or informally as he prefers, and even for the sole purpose of making evidence to prove what his choice was. Such declarations are not self-serving in an improper sense, unless they are made with intent to deceive. If they are false and made for a sinister purpose, they will meet the fate that falsehood always meets in courts of justice when discovered by the triers of fact.

Mrs. Newcomb, for many years domiciled in New York, had the absolute right to change her domicile to New Orleans. As she resided a part of the time in each city, she could select either as her domicile, provided she acted in good faith. She could make the change because she preferred the people, the climate or the laws of Louisiana to those of New York, or even because she wished to have her will proved and her estate settled there. She could accomplish nothing by merely pretending to change her domicile, while really intending to retain it in New York. If she had made the most formal declaration of intention for the purpose of creating evidence of an apparent change, with no intention of making an actual change, it would have been a fraud and of no effect. The good faith of her declarations, as well as the weight to be given them, was for the referee and surrogate, but they were competent as evidence. While acts speak louder than words, the words are to be heard for what they are worth. They should have received and the presumption is that they did receive the careful scrutiny of the experienced lawyers whose duty it was to weigh them, but it was for them to decide as a fact whether they expressed her honest intention, or were made upon the suggestion of interested parties, to conceal her real intention and circumvent the law.

Only one more class of rulings is pressed upon our attention as erroneous, which is remarkable in view of the length of the trial and the extent of the evidence.

Dr. Scratchley was sworn for the appellants and testified

that off and on for twenty years before the death of Mrs. New-comb he had been her attending physician. After stating that she was at Dr. Chamberlain's residence in the city of New York continuously from the fall of 1900 until her death in the spring of 1901, he was asked by the counsel for the appellants the following question : " Was there anything in her physical condition to keep her from going to New Orleans if she wished ? "

This was objected to as calling for " answers as her attend-ing physician." The objection was sustained and the appellants excepted.

The witness then stated that Mrs. Newcomb never said to him that she desired to return to New Orleans, and that she told him she wanted to die in New York and be buried in Greenwood Cemetery ; that while she was living at Dr. Cham-berlain's in 1900 and 1901 she discussed with the witness the question of her return to New Orleans ; that he saw her socially and professionally both during all his acquaintance with her ; " at that time, too, she wasn't continuously ill at that time ; * * * she would tell me that she had received letters from her friends and that they were urging her to come to New Orleans ; that her home was waiting for her. She never expressed a desire to go ; she said that she was ill and that she was comfortable here, and that she was going to die and she wanted to die here. When I say here, I refer to New York, at Dr. Chamberlain's, where she was living." Dr Scratchley was then asked the following question: " Was Mrs. Newcomb's condition such that she could not have gone to New Orleans ? " There was the same objection, ruling and exception. The doctor then stated : " I saw Mrs. New-comb in New York in the winter of 1898, December. She remained at the Fifth Avenue Hotel until June, 1899." He was then asked : " During that time was she in a condition to go to New Orleans if she had wished to ? " He was also asked : " What was the condition — physical condition of Mrs. Newcomb from 1898 on ? " These questions were excluded upon the same objection and exceptions were duly taken.

The object of these questions was to show that Mrs. New-comb was not prevented by sickness from returning to New Orleans during certain years. They involved her physical condition, with reference to the effect of any disease, ailment or infirmity that she may have had. There was no attempt to limit the answers of the witness to what he observed when not in attendance upon her as a physician. The questions were general in character, and called for the result of his observation as to the diseases with which his patient was afflicted and for which he had treated her professionally. While a responsive answer to any of the questions would not necessarily have included the mention of any particular disease, it might have included the statement that the decedent was suffering from a disease of such a nature as to prevent her from traveling. That statement might have involved the disclosure of information acquired in a professional capacity and necessary to enable the physician to act in that capacity. Diseases are discovered by a personal examination of the patient in connection with information as to feelings and symptoms furnished by the patient. While the question is close, we think the spirit of section 834 of the Code of Civil Procedure might have been violated if the witness had been allowed to answer.

But, assuming that the rulings were erroneous, they do not require a reversal of the order. The trial was of unusual length, and during such a protracted and sharply contested investigation errors of minor importance are apt to creep into the record. We doubt if the matter could be tried over again with a smaller percentage of error. Courts are practical agencies of government for the administration of justice and theoretical perfection is seldom attained. A close scrutiny of slight errors tends to retard the transaction of judicial busi-ness and to hamper the adjustment of legal differences. These remarks are especially applicable to rulings in Surrogate's Court, for the statute directs us not to reverse a decree or order of that court "for an error in admitting or rejecting evidence, unless it appears to the appellate court that the

exceptant was necessarily prejudiced thereby." (Code Civ. Pro. § 2545.) This section destroys the presumption of injury that might otherwise obtain. (*Matter of Will of Smith,* 95 N. Y. 516, 527.) Assuming that the rulings now under consideration were erroneous, they did not constitute reversible error, because the appellants were not necessarily prejudiced thereby. We are convinced from an examination of the evidence that the referee and surrogate would have reached the same conclusion even if the witness had stated that the physical condition of Mrs. Newcomb did not prevent her from going to New Orleans during the years in question.

The order of the Appellate Division should be affirmed, with costs.

CULLEN, Ch. J., GRAY, HAIGHT, WERNER, HISCOCK and CHASE, JJ., concur.

Order affirmed.