Matter of the Estate of FERDINAND BLUMENTHAL, Deceased.

(Surrogate's Court, New York County, August, 1917.)

Domicile — intention to abandon — wills — evidence — transfer tax.

The evidence in a transfer tax proceeding upon the issue as to the last domicile of a decedent who in his last will and in a codicil thereto described himself as " of the city of New York temporarily sojourning in Paris " where he had a home, but who died at sea on his way to New York, considered, and *held*,

not to show intention to abandon New York and acquire France as his domicile, and that he was at the time of his death a resident of the state of New York.

TRANSFER TAX proceeding.

Carter, Ledyard & Milburn, for estate of Ferdinand , Blumenthal, deceased.

Lafayette B. Gleason, for state comptroller.

COHALAN, S.   This is a transfer tax proceeding, in which the question at issue is the domicile of the decedent.   Ferdinand Blumenthal was born in Germany in the year 1847.   He emigrated to the United States when about twenty-three years of age, settled in New York city, engaged in his own name in the leather business, acquired a house at No. 57 East Fifty-sixth street and married the daughter of a New York family.   She, with the two children of the marriage, now survives him.   In 1879 he was naturalized as an American citizen in the Superior Court of New York city.   With the passing years he attained eminent success in the business world, developed greatly the manufacturing end of his concern, formed a partnership, and in 1889 admitted to that partnership his brother-in-law, J. Stevens Ulman, the firm being styled F. Blumenthal Company.   He retained, however, the controlling interest therein.   In April, 1895, he made this will, a lengthy document involving trusts under the New York law, and described himself therein as '' of the City of New York temporarily sojourning in Paris, France.''   In 1909 he purchased a plot of land in Paris, and began at once the erection of a palatial residence.   In 1910, while the same was nearing completion, he executed, in Paris, a codicil to his will and described himself as '' of the City of New York temporarily sojourning in

the City of Paris." Later in the same year he made a French will disposing of this Paris house and its effects, and described himself therein as " a merchant and American citizen of the State of New York." It was also in this year that the decedent's business was incorporated under the laws of the state of Delaware, with the decedent as president, an office he held continuously until his death. There is some conflict of evidence as to precisely when he moved into this house located at No. 34 Avenue de Bois de Boulougne, Paris, and in view of the position taken by the executors it becomes important to fix the date. The decedent's son first testified that it was in 1911, but later changed this to either the end of 1911 or towards the first of 1912. The decedent's secretary stated first, quite emphatically, that it was in the spring of 1912, but later admitted that this was only his best recollection. On the other hand, the decedent's brother-in-law was able to remember numerous luncheons and repeat several conversations which he had with the decedent in June and July, 1911, " at his residence in Paris, 34 Avenue de Bois de Boulougne." I am convinced, therefore, that the decedent first occupied this house not later than June, 1911. In November, 1911, at Paris, he executed a revocation of the power of attorney given to his brother-in-law in 1895, and described himself " as of the City, County and State of New York." Almost from the time his secretary entered his employ in 1905 the decedent's health began to fail, and he suffered from eye strain, intestinal trouble and hernia. This made travel more difficult for him, so that in his last years he canceled his different trips, save the one to Lucerne in July and August of each year. In August, 1914, he was at Lucerne with his secretary. He was registered with the American consulate agent there as " Ferdinand

Surrogate's Court, New York County, August, 1917.    [Vol. 101.

Blumenthal, New York, stopping at the Hotel National, Lucerne.'' War having been declared, travel to France became uncertain, and between that and the desire to be at the helm of his business in this time of stress he determined to go to New York. Wrapping the American flag around his house in Paris, because, as he writes, '' The *Herald* stated that Americans should register their residences in Paris under the protection of the American Embassy,'' so that, as he frankly confesses in a later letter, '' in case of damage I might have some claim for compensation,'' he boarded the steamship *Patria,* bound from Naples to New York. He died at sea off the coast of Spain, October 20, 1914. The body was landed at the port of Almeria, Spain, the American consul there reporting the death of an ''American citizen.'' It was forwarded to Paris, the funeral being from the American Protestant chapel there. He never took any of those steps which are prescribed by the Code Napoleon for the purpose of acquiring a domicile in France, and he was registered with the commissariat of police at Paris as an American citizen. Despite the record, the executrix and executor, his widow and eldest son respectively, describing themselves in their oaths of office filed in this court '' as temporarily sojourning in the City of Paris, France, and have no actual address at the present time in the United States,'' resist the attempt to impose any transfer tax upon the decedent's estate upon the ground that at the time of his death he was domiciled in Paris, France. They cluster their arguments around the contention that the decedent definitely abandoned his New York domicile about the time he moved into his new house, *i. e.,* as they put it, '' in the spring of 1912.'' There is no doubt that this palatial residence, with its conveniences, added greatly to the comfort of the dece-

dent. But taking into consideration his wealth, his requirements along certain lines because of his physical disorders and his wife's social ambitions, the purchase of a private residence in a city where he was accustomed to spend so much of his time is not as significant as the executors would have it appear. Moreover, I have fixed this house moving as not later than June, 1911, and there is the sworn statement of the decedent made in November, 1911, to the effect that he is " of the City, County and State of New York." Here let me consider the contention that in his latter years the decedent gradually lost his interest in his business and allowed his brother-in-law and son to manage the same. I think the record is filled with testimony to the contrary. He controlled the partnership, he became and remained president of the corporation, he hastened to the business when it was beset by the panics of 1903 and 1907, and he died on his way to be near the seat of action in the strenuous days subsequent to the declaration of the present war. Read his letters which are in the record, and you arise convinced that up to the day of his death here was the man at the helm of the F. Blumenthal Company. Stress is laid upon the decedent's part in the life of Paris, his art collection and his interests in artists and his friends, who, it is testified, were chiefly exclusively French. I think it is pretty evident that he took little interest in the life of Paris. His secretary testifies that he rarely went out, and his letters confirm this. Undoubtedly his art collection was of interest to him, yet it was by no means a centre around which his life gravitated. As for his friends, a reading of the list as given by his brother-in-law seems to indicate that they were very cosmopolitan. The executors marshal before me a number of statements made to the son Cecil, the brother-

in-law J. Stevens Ulman, the valet Allesina, the secretary Bowen and the attorney Baylis. Some of these were made subsequently to 1911, others prior thereto, I have considered them carefully, and have carefully weighed their source, their phraseology and the circumstances surrounding their utterance, and I am convinced that they fail to equal, far less to outweigh, the acts and solemn declarations which I have already summarized. The leading case of *Matter of Newcomb,* 192 N. Y. 238, 250, lays down the following guiding rule: " Less evidence is required to establish a change of domicile from one state to another than from one nation to another. In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence is of no avail." Residence there undoubtedly was. Was there intention? When I consider that this man, who was a native of Germany, took, after a seven-year residence in the United States, the necessary steps to become a citizen, thus manifesting in no uncertain terms his election to make this his home, but failed, although living in Paris for fourteen years, to take any of those steps prescribed by the Code Napoleon for the acquisition of residential privileges; when I consider that he made his fortune in the United States, kept it here and retained to the very day of his death a vital grasp on the financial affairs of his business, coming to watch over it in times of peril; when I consider that in every formal declaration of his life, so far as it appears where it became necessary for him to state his domicile, he invariably claimed it as the state of New York and not France; when I consider that at the outbreak of the present war he hastened to avail himself of the protection of our flag, and that on every occasion when it inured to his benefit he claimed American citizenship and residence in

New York city, I am convinced that, although he liked his Paris home because of its conveniences and the opportunity it afforded for the social activities of his wife, he had '' no absolute and fixed intention to abandon one and acquire another '' (*Matter of Newcomb, supra,* 251), to abandon New York and acquire France as his domicile, and I hold that he was at the time of his death domiciled in the state of New York, and accordingly remit the report to the appraiser.

Decreed accordingly.