Graham Ct. Owners Corp. v Memminger (2024 NY Slip Op 50178(U))

[*1]

Graham Ct. Owners Corp. v Memminger

2024 NY Slip Op 50178(U)

Decided on February 22, 2024

Civil Court Of The City Of New York, New York County

Bacdayan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 22, 2024
Civil Court of the City of New York, New York County

Graham Court Owners Corp., Petitioner,

against
Richard Memminger, Respondent.

Index No. 311822-22

Shivers and Associates (Charles Alan Loveless, Esq.), for the petitioner
Richard Memminger, respondent pro se

Karen May Bacdayan, J.

Recitation as required by CPLR 2219 (a), of the papers considered in review of this motion by NYSCEF Doc No. 28-61.
BACKGROUND
This is a licensee holdover proceeding commenced by petitioner against Richard Memminger ("respondent"), pursuant to Real Property Actions and Proceedings Law ("RPAPL") § 713 (7), after the death of the tenant of record, Melita Apogal-Radji (hereinafter "Maleta," as this is how she is known to respondent), who died on June 19, 2021. The premises from which petitioner seeks removal of respondent is1925 Seventh Avenue, Apt 5I, New York, NY 10026.
Respondent has asserted a non-traditional family member succession claim to this rent stabilized apartment, based on his non-biological, brother-sister like relationship with Maleta. The parties agreed to informal discovery. [FN1]
Respondent produced some, but not all, of the documents requested in petitioner's demand. Now before the court is petitioner's motion for summary judgment, or, in the alternative, for an order 1) requiring respondent to produce additional documentation or a sworn affidavit as to why said documentation is not available after a diligent search, 2) requiring respondent to sit for a deposition, and 3) should respondent fail to comply with the court's directive, an order of preclusion pursuant to CPLR 3126. (NYSCEF Doc No. 28, notice of motion [sequence 2].)
Important to this decision is the fact that two nonpayment proceedings were recently discontinued against respondent, both concerning a different apartment from that which respondent seeks to succeed herein, to wit, 518 West 159th Street, Apt 2B, New York, NY 10032. (NYSCEF Doc No. 29, petitioner's attorney's affirmation ¶¶ 5-7.) Respondent does not dispute that the first nonpayment proceeding, Dorothy McGowan, LP v Richard Memminger, [*2]Civ Ct, New York County, index No. 304764/20, was discontinued when the petition was satisfied by approval for and payment of respondent's Emergency Rental Assistance Program ("ERAP") application for rent arrears covering the period of March 2020 to September 2021, and a Department of Social Services ("DSS") payment of $5,450.28 covering the rent arrears for March 2021 through and including March 2022. (Id. ¶ 6.) The Legal Aid Society ("LAS") appeared for respondent on September 14, 2021. [FN2]
On October 11, 2021, during the pendency of that proceeding, respondent and the petitioner executed a rent stabilized renewal lease for 518 West 159th Street, Apt 2B, the term for which was April 1, 2021 through March 31, 2023.[FN3]
This lease presumably renewed a prior renewal lease for 518 West 159th Street, Apt 2B, on the same terms and conditions. In addition, petitioner points out that the predicate rent demand in that proceeding was served by personal service on respondent at 518 West 159th Street, Apt 2B "on September 21, 2020 . . . and [the affidavit of service] contains an accurate description of [r]espondent." ( NYSCEF Doc No. 29, petitioner's attorney's affirmation ¶ 6.)
The petition for the second nonpayment proceeding, Dorothy McGowan, LP v Richard Memminger, Civ Ct, New York County, index No. 314936/23, alleges that the premises located at 518 West 159th Street is subject to regulatory agreements which set the maximum rent for low-income renters in order to provide affordable housing to individuals like respondent. [FN4]
That proceeding was discontinued in December 2023.
Turning to the immediate motion, respondent filed an "answer in opposition" on January 9, 2024, averring that "[i]n March of 2019 I agreed to move in with Maleta full time to support her while she was sick with cancer. From June 2019 until her death in [June] 2021 I lived with her full time. 1925 [Seventh Avenue] has been my primary residence since June 9, 2019[.]" (NYSCEF Doc No. 49, Memminger affidavit at 1.) [FN5]
Respondent explains, "The original intention was for me to live with Maleta until she got better. I accompanied her to some of her doctors' visits at Mount Sinai and helped her around the house. She paid the bills and I kept her and the house clean." (Id.) Respondent explains his receipt of ERAP and DSS benefits at 518 West 159th Street as follows: " Even though I was not physically living at Dorothy McGowan LP, 518 West 159th Street, Apt 2B at the time, I understood that I was still responsible for the [*3]rent owed." (Id.) Respondent states that he was advised by an unidentified person or organization to apply for ERAP. (Id.) Respondent explains the reason that he signed the lease for a term of two years for 518 West 159th Street, Apt 2B, is that he was also advised (presumably by LAS, who represented him at the time he signed the lease renewal) to sign a new lease with the owner of that building, Dorothy McGowan LP. Respondent explains his actions as follows: "I was unaware of how sick Maleta was at the time, so I wanted to ensure that I had guaranteed housing when she got better. Maleta and I were still quarantining due to the Covid-19 pandemic." (Id.)
Respondent continues: "Maleta expressed my taking over the apartment on several occasions for several years. I have known Maleta for over 10 years and it is my belief that we have established a non traditional family relationship. We have attended family gatherings, celebrated each other's birthday and affectionately referred to each other as brother and sister. Which is why Maleta completed Notice To Owner Of Family Members Residing With The Named Tenant In The Apartment Who May Be Entitled To Succession Rights/Protection from Eviction (RA-23.5 (10/20) which was then forwarded to the landlord [on June 2, 2021]." (NYSCEF Doc No. 49 at 4; NYSCEF Doc No. 45, petitioner's exhibit O at 2.) Maleta died 17 days later, on June 19, 2021. Respondent states that he has followed up with petitioner numerous times to obtain information on the status of his request to succeed to the apartment located at 1925 7th Avenue, Apt 5I. (NYSCEF Doc No. 49, Memminger affidavit at 2.)
Prior to petitioner's service of its motion for summary judgment, respondent produced documents in partial compliance with petitioner's discovery demands to support his succession claim. All of those documents are available at NYSCEF Doc No. 45, petitioner's exhibit O, to wit: state and federal tax returns for the 2021 tax year indicating the 1925 7th Avenue address; 2022 ConEdison bills addressed to Maleta and respondent, all after Maleta's death; respondent's Verizon bills from 2022 (all outside the relevant time period); four undated photographs of respondent purportedly taken with Maleta, one in what appears to be a hospital room, and three with Maleta and other unspecified individuals at an unspecified gathering; and text messages between Maleta and respondent prior to June 2019, in which Maleta wishes respondent a "happy birthday," and refers to respondent as her "baby brother" to which he responds, "Thanks big sis." There are other texts in which Maleta calls respondent "baby bro" and refers to herself a "big sister." In another text, Maleta says, "That's why I love you." The text messages additionally indicate Maleta asking for 15 minutes of respondent's time to help her with "lifting and bending." Also included is a sworn statement from Michael Britto, a friend of respondent and the informant of Maleta's death, attesting that he has known respondent for 15 years and has "seen firsthand the familial relationship between [respondent and Maleta]," and a sworn statement from Maleta's niece, attesting to Maleta and respondent's family-like relationship. (NYSCEF Doc No. 45, petitioner's exhibit O at 33-36, Britto and Norton affidavits.)
Subsequent to petitioner's service of its motion for summary judgment, respondent produced the following additional documents: W-2 forms for 2019 and 2020, indicating respondent's address as 518 West 159th Street, Apt 2B; Chase Bank records from the relevant time period, indicating that his address was at all times 518 West 159th Street, Apt 2B; a 2020 New York State ("NYS") tax return, indicating respondent's filing address as 518 West 159th Street, Apt 2B; a 2020 NYS amended tax return, indicating 518 West 159th Street, Apt 2B as respondent's address; a 2021 NYS application for extension of time to file, indicating the subject premises as his address, but confusingly instructing that the tax return be sent to 518 West 159th Street, Apt 2B; 2022 federal and NYS tax returns, indicating 1925 7th Avenue, Apt 5I as [*4]respondent's address; a Board of Elections voter registration search result, dated November 27, 2023, indicating 1925 7th Avenue, Apt 5I as respondent's registered address; a NYS driver's permit, which expired in June 2020, indicating 518 West 159th Street, Apt 2B as respondent's address. (NYSCEF Doc Nos. 52-53, 55, 58-59.) Respondent also provided an additional affidavit from a neighbor, Julia Daniels, attesting to knowing respondent and Maleta for 10 years and characterizing their relationship as "one of mutual affection and support," and "attest[ing] to the fact that [aside from respondent] [Maleta] did not have any other close relatives or family members who visited her regularly or assisted her with day-to-day activities." (NYSCEF Doc No. 60, petitioner's exhibit J at 3-4, Daniels affidavit ¶¶ 5-6.)
The court held oral argument on February 13, 2024.
DISUCSSION
Applicable Law
A court may employ the drastic remedy of summary judgment only where there is "no doubt as to the absence of triable issues." (Andre v Pomeroy, 35 NY2d 361, 364 [1974] [internal citation omitted].) "On such a motion, the court's function is to find rather than decide issues of fact." (Southbridge Towers, Inc. v Renda, 21 Misc 3d 1138 [A], 2008 NY Slip Op 52418 [U] [Civ Ct, NY County 2008], citing Epstein v Scally, 99 AD2d 713 [1st Dept 1984].) The facts must be considered "in the light most favorable to the non-moving party[.]" (Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011].) Only upon a prima facie showing of entitlement to summary judgment, does the burden shift to the non-moving party to establish material issues of fact requiring a trial. (Vega v Restani Const. Corp., 18 NY3d 499, 503 [2012].) When determining a summary judgment motion, courts should not decide issues of credibility. (See Glick & Dolleck, Inc. v Tri-Pac Export Corp., 22 NY2d 439, 441 [1968].) If an issue is "fairly debatable a motion for summary judgment must be denied." (Stone v Goodson, 8 NY2d 8, 12 [1960] [internal citations omitted].) " [A]n unfounded reluctance to employ the remedy will only serve to swell the [t]rial [c]alendar and thus deny other litigants the right to have their claims properly adjudicated." (Pomeroy, 35 NY2d at 364.)
To succeed to a rent stabilized tenancy as a nontraditional family member, the would-be successor must demonstrate that they are 1) a family member whether biological, through marriage, or nontraditional, and 2) that they primarily resided with the tenant of record for two years immediately prior to the death or permanent vacatur of the tenant of record. (Rent Stabilization Code ("RSC") [9 NYCRR] § 2523.5 [b] [1].) The RSC provides evidentiary factors to be considered when determining whether a person has sufficient emotional and financial commitment to the former tenant of record to qualify for non-eviction protections. (RSC § 2520.6 [o] [2].) These factors, none of which are solely determinative, include, without limitation:
"i. longevity of the relationship;
ii. sharing of or relying upon each other for payment of household or family expenses, and/or other common necessities of life;
iii. intermingling of finances as evidenced by, among other things, joint ownership of bank accounts, personal and real property, credit cards, loan obligations, sharing a household budget for purposes of receiving government benefits, etc.;
iv. engaging in family-type activities by jointly attending family functions, holidays and celebrations, social and recreational activities, etc.;
v. formalizing of legal obligations, intentions, and responsibilities to each other by such means as executing wills naming each other as executor and/or beneficiary, conferring upon each other a power of attorney and/or authority to make health care decisions each for the other, entering into a personal relationship contract, making a domestic partnership declaration, or serving as a representative payee for purposes of public benefits, etc.;
vi. holding themselves out as family members to other family members, friends, members of the community or religious institutions, or society in general, through their words or actions;
vii. regularly performing family functions, such as caring for each other or each other's extended family members, and/or relying upon each other for daily family services;
viii. engaging in any other pattern of behavior, agreement, or other action whichevidences the intention of creating a long-term, emotionally committed relationship[.]" (RSC § 2520.6 [o] [2] [i] — [viii].)
Historically mere roommates have not been considered family members; however, courts have been increasingly willing to find that, under certain sets of facts, a roommate relationship can be elevated to that of a nontraditional family relationship. In RHM Estates v Hampshire, 18 AD3d 326 (1st Dept 2005) the Appellate Division, First Department upheld the Housing Court's determination that respondent was entitled to succeed to his deceased roommate's rent controlled apartment despite the lack of evidence supporting an intermingling of finances. The court considered that:
"the two shared holiday and birthday celebrations, traveled together and traditionally ate their breakfast together in the subject apartment. . . . It is of note that respondent spent substantial time caring for [the deceased] throughout a lengthy battle with cancer, which eventually took her life. Further, respondent used the apartment's address on a W-2 form, a bank statement and a voter registration form. He also received his mail there. There is no evidence that he had any other address (emphasis added.)" (RHM Estates, 18 AD3d at 327.)
In Roberts Ave. Assocs. v Sullivan, 2003 NY Slip Op 51091(U) (App Term, 1st Dept 2003) the court found a nontraditional family relationship between two men had formed over two decades of residing together:
"Respondent's uncontested testimony at trial established that he enjoyed a long-term committed relationship with the deceased rent-controlled tenant for 20 years; that he performed household duties while relying upon tenant for financial support; that the parties celebrated holidays together; that respondent was given a power of attorney to conduct tenant's banking; that the tenant was wheelchair bound for the last five years of his life and entirely dependent on the respondent's care; and that respondent arranged and paid for the decedent's burial." (Sullivan, 2003 NY Slip Op 51091[U], *1.)
In Colon v Frias, 162 Misc 2d 36 (Civ Ct, New York County 1994), the court found that two women were "more like sisters" despite not being biologically related or in a "gay relationship," because the evidence demonstrated that the respondent "lived with [the deceased tenant] for 34 years," and that "but for the lack of a blood relationship, [the tenant and occupant] were sisters." (Frias, 162 Misc 2d 36 at 38, 40.)
However, in Seminole Realty Co. v Greenbaum, 209 AD2d 345 (1st Dept 1994), the court found that a woman who continued to live in a rent stabilized apartment after the death of another woman was not entitled to succession. The purported successor had maintained that she and the deceased tenant of record were like "sisters." In upholding the trial court, and finding that the "relationship . . . was that of a close friend and roommate," the court held that the relationship was
"not characterized by the requisite 'emotional and financial commitment and interdependence' connoting a family relationship, and that she was therefore not entitled to succession rights to the subject rent stabilized apartment as a nontraditional family member under the standards set forth in the [RSC]. The women never intermingled their finances or jointly owned real or personal property, held themselves out as a family unit, executed documents formalizing legal obligations, jointly celebrated most major holidays or attended important celebrations with each other's families (internal citations omitted)." (Id. at 345-346.
While, as demonstrated above, it is possible to establish a nontraditional family member relationship between friends and roommates, courts are not always amenable to finding the would-be successor utilized the subject premises as their primary residence — an essential element to a successful succession claim — when government documents indicate a different address for the party seeking succession rights. Decisions from nonprimary residence holdover proceedings inform the court as to the probative nature of other residences on government documents. For example, in Katz Park Ave. Corp. v Jagger, 11 NY3d 314 (2008), the Court of Appeals held that "absent some unusual circumstance, a primary residence in New York and a B-2 [tourist] visa are logically incompatible." (Jagger, 11 NY3d at 317.) Citing to Jagger, in Matter of Ansonia Assocs. L.P. v Unwin, 130 AD3d 453 (1st Dept 2015), the Appellate Division, First Department found that the tenant's "position that the apartment is her primary residence" was "logically incompatible" with and "contrary to declarations made under the penalty of perjury on income tax returns." (Unwin, 130 AD3d at 454 [internal citations and quotation marks omitted]; see also Mahoney-Buntzman v Buntzman, 12 NY3d 415, 422 ["A party to litigation may not take a position contrary to a position taken in an income tax return."] [internal citation omitted].)
Notwithstanding the foregoing, other courts have relied on testimonial evidence which outweighed the absence or contradictory nature of information provided on income tax returns. In 631 Edgecombe, LP v. Walker, 69 Misc 3d 145 (A), 2020 NY Slip Op 51395 (U) (App Term, 1st Dept 2020), the Appellate Term, First Department found that "[t]he absence of certain other documentation, such as respondent's tax returns and cell phone records, is not dispositive, since the court accepted his excuse for failing to produce such records, i.e., he lacked assets and did not file tax returns, and there is a preponderance of credible personal testimony." (Walker, 2020 NY Slip Op 51395 [U], *1 [internal quotation marks and citations omitted].) In 300 E. 34th St. Co. v Habeeb, 248 AD2d 50 (1st Dept 1997), the Appellate Division, First Department held under the facts and circumstances of that case that "while documentation, or the absence thereof, might be a significant factor in evaluating primary residency, especially in the case of the dubious credibility of witnesses, it would not be a dispositive factor especially when there is a preponderance of credible personal testimony." (Habeeb, 248 AD2d at 55 [internal citations omitted]; see also 111 Realty Co. v Sulkowska, 21 Misc 3d 53, 54 [App Term, 1st Dept 2008] [*5]["A tenant's declaration of residence on a tax-related document, while one of many factors to be considered in determining primary residence, is not dispositive as a matter of law, especially in the context of a motion for summary judgment."] [internal quotation marks and citations omitted].)
Application of The Law to the Facts
With the exception of Sulkowska, which denied a landlord's motion for summary judgment as material questions of fact existed regarding a "snowbird" residing in both Florida and in a rent stabilized apartment in New York City, all of the other cases cited supra were decided after trial and many relied on testimonial evidence to carry the day. As this court is in favor of a more contemporary and realistic definition of family — and in view of respondent's eloquent, albeit unsworn, narrative, the effect of the COVID-19 pandemic on living arrangements, and Maleka and respondent's apparently very close relationship  the court was initially considering denying petitioner's motion for summary judgment and allowing respondent to continue to trial on his nontraditional family member claim. (See e.g. W. 49th St., LLC v O'Neill, 77 Misc 3d 385 [Civ Ct, New York County 2022].)
In that vein, it has been held that "the absence of documentary evidence does not undermine a succession claim when the totality of the testimonial evidence ... establishes the requisite emotional and financial commitment (emphasis added)." (530 Second Ave. Co., LLC v. Zenker, 160 AD3d 160, 2018 NY Slip Op. 02143 [1st Dept. 2018], citing Arnie Realty Corp. v. Torres, 294 AD2d 193 [1st Dept. 2002].) Regarding respondent's documentary evidence, the court notes the deference given by appellate courts to a trial judge's findings. For example, the trial court in 631 Edgecombe, LP v Walker, supra, credited respondent's "excuse[s]" for his failure to provide tax returns. (Walker, 2020 NY Slip Op 51395 [U], *1; see also Braschi v Stahl Assocs. Co., 74 NY2d 201, 213 ["the presence or absence of one or more of [the enumerated factors] is not dispositive since it is the totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties which should, in the final analysis control."]) [FN6]

While respondent demonstrates some indicia of a nontraditional family relationship, and this court is amenable to an evolving concept of family, respondent cannot demonstrate that he utilized the subject apartment as his primary residence for two years prior to the tenant of record's permanent vacatur. This, along with a family-like relationship, is an essential element which must be established to succeed to a rent regulated apartment.
Respondent has produced not only a scarcity of documentary evidence placing respondent at the subject premises as his primary residence for the entire two years before Maleta's death, but has also produced numerous documents indicating that respondent treated 518 West 159th Street, Apt 2B as his primary residence between June 20, 2019 and June 19, 2021, and greatly benefitted financially from same. Indeed, respondent does not deny that he received government benefits (ERAP funds and public assistance) in order to preserve his [*6]regulated tenancy at 518 West 159th Street, Apt 2B for the months of March 2020 to September 2021, falling within the two years prior to Maleta's death.
This case is distinguishable from the cases cited supra, where a tenant established the locus of their primary residence despite the lack of documentation, 631 Edgecombe, LP v Walker, or a contradictory statement on a tax return, 111 Realty Co. v Sulkowska. Here, respondent has not failed to produce relevant documents; rather, respondent has produced overwhelming evidence of possession of another affordable, regulated apartment in New York City during the entire relevant period. Moreover, respondent did not make just one logically incompatible statement to a government authority; he made many. Every W-2 form indicates that respondent resided at 518 West 159th Street, Apt 2B during the relevant time period. Respondent represented to both the NYS Department of Taxation and Finance and the Internal Revenue Service that he primarily resided at 518 West 159th Street, Apt 2B during most of the two years prior to Maleta's death. Respondent represented to the OTDA and public assistance that he qualified for government monies to save his rent stabilized home at 518 West 159th Street, Apt 2B. Respondent then accepted those approved funds during a State of Emergency and a critical housing crisis when approximately 21,000 other single adults were sleeping in homeless shelters and thousands of others were on the street. [FN7]
Respondent's rent stabilized lease renewal of a prior two-year renewal lease that expired in 2021, which itself expired in 2023, demonstrates that, at all times during the relevant time period, respondent maintained possession and control of another rent stabilized apartment.
Apropos respondent's lack of intention to make Maleta's apartment his primary residence, the court notes that while a person may have multiple residences, a person may have only one domicile. (Id. at 612; 417 E. Realty Assocs. v Ryan, 110 Misc 2d 607 [Special Term, New York County 1981] ["We may even establish more than one place of residence; keeping, however, only one domicile."].) As explicated by the Court of Appeals in In re Newcomb's Est., 192 NY 238 (1908):
"In order to acquire a new domicile there must be a union of residence and intention. Residence without intention, or intention without residence, is of no avail. Mere change of residence, although continued for a long time, does not effect a change of domicile, while a change of residence even for a short time, with the intention in good faith to change the domicile, has that effect." (Id. at 250.)
In the absence of the ability to establish the subject apartment as his primary residence, to allow respondent to continue litigating his claim would not "serve the important remedial purpose of preventing dislocation of long-term residents due to the vacatur of the head of household." (Jourdain v New York State Div. of Hous. & Cmty. Renewal, 159 AD3d 41, 45 [2d Dept 2018] [internal quotation marks and citation omitted].) Nor would it be "in the spirit of the statutory scheme, whose goal is to facilitate the availability of affordable housing for low-income residents and to temper the harsh consequences of the death or departure of a tenant for their 'traditional' and 'non-traditional' family members." (Murphy v New York State Div. of Hous. & Cmty. Renewal, 21 NY3d 649, 653 [2013] [internal citations omitted].) Other than the [*7]regrettable death of his beloved "big sister," respondent will suffer no hardship if he is displaced from the apartment to which he seeks succession, nor is he a long-term tenant of the subject premises who will face homelessness as a result. Respondent can return to his rent stabilized apartment at 518 West 159th Street, Apt 2B which he has fought to maintain with the assistance of LAS and from the government.
Based on the foregoing caselaw and undisputed facts, as well as the copious documents placing respondent at 518 West 159th Street, Apt 2B during the entire two years prior to Maleta's death, the court finds respondent has not raised a material issue of fact regarding whether or not 1925 7th Avenue, Apt 5I was his primary residence between June 20, 2019 and June 19, 2021. Even if respondent could demonstrate a nontraditional sibling relationship with Maleta, he cannot establish that the subject premises was his primary residence within the meaning and spirit of the Rent Stabilization Law during the relevant time period, an absolutely necessary precondition to succeed to possession of a regulated apartment. 
CONCLUSION
Accordingly, it is
ORDERED that petitioner's motion for summary judgment is GRANTED; and it is further
ORDERED that a judgment of possession shall enter in favor of petitioner, and a warrant may issue forthwith without a stay; and it is further
ORDERED that the earliest execution date is February 22, 2024.
Petitioner shall serve a copy of this decision and order upon respondent with notice of entry by regular mail, and file proof of same on NYSCEF.
This constitutes the decision and order of this court.
DATED: February 22, 2024
New York, NY
HON. KAREN MAY BACDAYAN

Footnotes

Footnote 1:Petitioner's document demands define the relevant time period as June 1, 2018 to June 18, 2022. However, the court finds that the relevant time period is June 20, 2019 to June 19, 2021, the date of Maleta's death, ultimately a distinction without a difference.

Footnote 2:NY St Cts Elec Filing [NYSCEF] Doc No. 12, notice of appearance, 
https://iapps.courts.state.ny.us/nyscef/CaseSearch (complete CAPTCHA, search by case index No. LT-304764-20/NY, click on index No. LT-304764-20/NY.)

Footnote 3:NY St Cts Elec Filing [NYSCEF] Doc No. 14, renewal lease, returned for correction but available to court employees, 
https://iapps.courts.state.ny.us/nyscef/CaseSearch (complete CAPTCHA, search by case index No. LT-314936-23/NY, click on index No. LT-314936-23/NY.)

Footnote 4:NY St Cts Elec Filing [NYSCEF] Doc No. 1, petition ¶ 7, 
https://iapps.courts.state.ny.us/nyscef/CaseSearch (complete CAPTCHA, search by case index No. LT-314936-23/NY, click on index No. LT-314936-23/NY.)

Footnote 5:Respondent's affidavit is not notarized, nor does it contain the language required by the recently amended CPLR 2106 in lieu of a notary. This alone could be a basis to grant summary judgment to petitioner. However, given that petitioner has not challenged respondent's opposition on this basis, because respondent is unrepresented, and because of difficult public policy concerns raised by the unique facts and circumstance herein, the court will disregard this omission.

Footnote 6:One of respondent's explanations for defending two nonpayment proceedings at the 518 West 159th Street address, and applying for ERAP and public assistance benefits for that apartment gives the court pause. Respondent stated, "I was unaware of how sick Maleta was at the time, so I wanted to ensure that I had guaranteed housing when she got better." (NYSCEF Doc No. 49, Memminger affidavit at 1.) Respondent was hedging his bets, as it were, indicating a lack of self-sacrifice, and lack of an intent to make Maleta's apartment his home. 

Footnote 7:Coalition for the Homeless, State of the Homeless 2021, available at https://www.coalitionforthehomeless.org/wp-content/uploads/2021/04/StateofThe-Homeless2021_Apr28-1.pdf (last accessed Feb. 18, 2024.)