In the Matter of the Transfer Tax upon the Estate of LAMON V. HARKNESS, Deceased.

HARRY S. HARKNESS and Others, as Administrators, Appellants; THE COMPTROLLER OF THE STATE OF NEW YORK, Respondent.

First Department, May 31, 1918.

**Tax — transfer tax — domicile of decedent — burden of proof — evidence not establishing domicile in this State.**

Appeal by administrators from an order of the Surrogate's Court in a transfer tax proceeding based upon a determination that the decedent at the time of his death was domiciled in the State of New York. The decedent, a man of wealth, had at various times maintained establishments in other States and had traveled extensively. Evidence examined, and *held*, that the decedent at the time of his death was not a resident of the State of New York but was a resident of Kentucky and that his estate should be appraised as that of a non-resident.

In determining a decedent's domicile his intent is the controlling consideration and this will be determined by his history, manner of life, activities and interests, rather than by his declarations, either written or oral.

Where in a transfer tax proceeding the Comptroller claims that a decedent abandoned one residence and adopted another, the burden of proof rests upon him.

APPEAL by Harry S. Harkness and others, as administrators, from an order of the Surrogate's Court of the county of New

York, entered in the office of said Surrogate's Court on the 20th day of February, 1917.

*George Welwood Murray* of counsel [*Robert H. Strahan* and *William Roberts* with him on the brief; *Murray, Prentice & Howland,* attorneys], for the appellants.

*William W. Wingate* of counsel [*Charles M. Travis* with him on the brief], for the respondent.

SHEARN, J.:

This is an appeal by the administrators of the estate of the decedent, Lamon V. Harkness, from an order of the Surrogate's Court remitting the proceedings to an appraiser to appraise the estate of decedent, upon the determination reached by the surrogate that the decedent at his death had his domicile in the State of New York.

The case presents solely the question whether the evidence establishes as a fact that on January 17, 1915, when the decedent died in California, his domicile was in the State of New York. The question arose mainly because the decedent for many years, like many other very wealthy men, maintained at one and the same time several places of residence in different States. This has led to more or less plausible claims as to his domicile at the instance of the taxing authorities of the States of New York, California and Kentucky. It becomes necessary, therefore, to determine the intent of the decedent and answer the question whether at the time of his death he considered New York to be his home. The Supreme Court of California has decided the question in favor of Kentucky. As the decedent's intent is a controlling consideration, it is helpful to review to some extent his history, manner of life, his activities and interests, for the inferences to be drawn from his acts and conduct are more important than declarations, either written or oral. (*Dupuy* v. *Wurtz,* 53 N. Y. 556, 562.)

The decedent was born in Ohio in 1850. At the age of nineteen he went to Kansas with his father and married there three years later. For substantially twenty years he resided continuously on his cattle ranch in Kansas, about twelve miles removed from the nearest village. He had no other place of abode. At the conclusion of this period he was about thirty-

eight years of age and his youngest child aged about eight. In 1888 Stephen V. Harkness, his father, a man of wealth, died. Just before his father's death the decedent left the ranch and established a home in Kansas City, Mo., where he remained for the ensuing two years actively engaged in the banking business. These two years were the only ones during his entire life when he carried on any commercial business. The remainder of his life was spent in retirement from actual business, excepting in so far as he looked after the extensive investments inherited from his father and engaged in breeding blooded horses and other live stock at his Kentucky farm, acquired in 1891. In the spring of 1891 decedent, being then forty years of age, determined to make his home in the east, and he came to New York city (stopping at a hotel) for the purpose of selecting a home. After examining various places, all of which were distinctively country places, he selected Greenwich, Conn., and purchased there an estate of about fifteen acres, with a house of some twenty rooms, with stables and greenhouses, formerly the home of William Rockefeller. He immediately removed his family and household from Kansas City directly to Greenwich and there established his home. He then had no other dwelling, and it is agreed that, beginning with the summer of 1891, his domicile was at Greenwich, Conn. In the winter of 1891–1892, some months after decedent purchased and occupied the Greenwich home, he purchased a stock farm in Kentucky of some 400 acres, with a colonial house on it, where, as soon as the house was put in a condition for occupancy the following year, the decedent was a frequent visitor at various seasons, and where, for the remainder of his life, except when traveling, he spent practically all of his time during the fall and winter. He was an inveterate traveler and an enthusiastic sportsman, and visited many places and climes for purposes of health and sport, but it is entirely apparent that his one great interest in life, outside of his family, centered more and more upon his place in Kentucky, which he enlarged to several thousand acres and developed into a great stock farm. This was, during the remainder of his life, the one house that he kept open all the year around, with a permanent staff of domestics, numerous automobiles and chauffeurs and all the *indicia* of a

real home.   No question arises, however, but that for at least four years after the purchase of the Kentucky farm, his domicile continued to be Greenwich, Conn.   In the winter of 1893–1894 decedent's two daughters were enrolled from the Greenwich home as students at a school in New York city and during that winter the decedent rented a furnished apartment at the Grenoble Apartment Hotel in that city, where he spent a part of the winter with his wife, the remainder of the winter being passed at the Kentucky farm.   The following summer decedent lived with his family at Greenwich as usual. The winter of 1894–1895 he passed at "Walnut Hall," as the Kentucky stock farm was called, and after stopping three weeks at the Plaza Hotel, in New York city, he and his family returned to the Greenwich home for the summer.

In the spring of 1895, when the time was drawing near for his daughters to take a more active part in social activities, decedent concluded to acquire a town house and purchased an unfinished house at 933 Fifth avenue in the city of New York. The construction of the New York house was not completed until the fall of 1896 and the winter of 1895–1896 was spent by decedent at Walnut Hall, his family, however, passing a part of the winter at the Plaza Hotel in New York city. The summer of 1896 found the family in the Greenwich home as usual.   The decedent now had three dwellings, one in Greenwich, one in New York and one in Kentucky.   Up to this time, however, his domicile concededly was at Greenwich.   The Comptroller contends that in the fall of 1896 the decedent abandoned Greenwich as his domicile, although he continued his residence there in the same manner as theretofore for upwards of ten years, and that he adopted New York city as his domicile.   On this issue the burden of proof rests upon the Comptroller, who asserts that a change of domicile was made. (*Matter of Newcomb*, 192 N. Y. 238, 250.)   So far as evidence of intent to abandon Greenwich and adopt New York as a domicile is to be inferred from decedent's manner of life after 1896, from his interests, and his use of the newly-acquired town residence, it is difficult to find any support whatever for the Comptroller's contention.   The Fifth avenue house was first opened in the fall of 1896, the household, consisting of the servants, wardrobes, horses,

First Department, May, 1918.          [Vol. 183.

carriages and automobiles, being removed from Greenwich for the winter social season. Decedent's daughters occupied the house during the winter of 1896–1897, decedent and his wife, however, spending the winter at Walnut Hall except for about two weeks around the Christmas holidays when they occupied the New York house with 'their daughters. The following summer of 1897 the family lived at Greenwich as theretofore and decedent spent the winter of 1897–1898 at Walnut Hall. The New York house was opened as in the preceding year and occupied by the daughters, but decedent and his wife were there for only two weeks. The summer of 1898 was spent at Greenwich as usual, and the autumn in Kentucky. The New York house was opened for only two and one-half weeks during the winter of 1898–1899, the occasion being the wedding of the elder daughter. Immediately after the wedding in November, 1898, the New York house was boarded up and the family went to California, returning from there to Greenwich for the summer of 1899. In the autumn of 1899 the New York house was again opened for a few days for the marriage of the younger daughter, and again boarded up. Decedent was at Walnut Hall for the holidays and then went to California for the remainder of the winter, returning to Greenwich as usual for the summer of 1900, except that in July and August he occupied a cottage at the Thousand Islands. The autumn found him again at the Kentucky farm, and the New York house was still closed, except for a few weeks in the winter of 1900–1901 when decedent's wife, who had been taken ill, was brought there so as to be more conveniently attended by New York physicians. Immediately upon his wife's convalescence decedent went to California for the remainder of the winter, returning from there to Greenwich for the summer of 1901. In the autumn of 1901 he went abroad, returning in June, 1902, to Greenwich, where he spent part of the summer, the balance of the time being spent at Walnut Hall, where he remained through the autumn of 1902, going with his family to California for the winter of 1902–1903. In the spring of 1903 he went to Europe, returning to Greenwich in September. He and his wife spent the winter of 1903–1904 at Walnut Hall. In 1904 he did not spend the summer at Greenwich, the occasion for this unusual

departure from his ordinary method of life being that he had caused his Greenwich house to be torn down in 1904; but, and this is significant with reference to any intention up to this time to abandon Greenwich, the purpose was that a new house might be constructed in accordance with plans that he had had made. In the meantime he rented a place nearby at Belle Haven. The summer of 1904 he spent yachting, going in September to Walnut Hall, and in the winter to California, and returning from there in the summer of 1905 to Belle Haven in the suburbs of Greenwich. It will be noted that he had not occupied his city residence for any purpose now for four years, during which time it was boarded up and in the hands of a caretaker.

In September, 1905, Mrs. Harkness became seriously ill at Greenwich and on September twenty-fourth she was removed to the New York house in order that she might be attended by a New York physician. The house was specially opened for this purpose. Mrs. Harkness died there three weeks later and was buried from there in Woodlawn Cemetery, which is between New York and Greenwich. After the funeral the house was boarded up and a caretaker was put in charge. A significant item of evidence at this point is that the decedent announced his intention of selling the New York house, and he put it in the hands of two well-known real estate firms for sale. No offer was ever made for it, however, at anything like the price at which the decedent held the property. Not only were the doors and windows boarded up but a wooden fence was erected along the Fifth avenue front of the house, a condition which continued from the death of Mrs. Harkness down to the day of decedent's death, except in the winter of 1907–1908 when one of his daughters opened up the house and occupied it for nine weeks. With this exception, from the death of Mrs. Harkness in 1905 until decedent's death in 1915, a caretaker continuously occupied the house throughout the year. The only use made of this house by the decedent during all of these years was that he slept in the house a few times when passing through town in 1907–1908, on which occasions the caretaker provided meals for him and, similarly, in 1910 and in December, 1911, he

slept in the house, in 1910 for three weeks and in 1911 for four or five nights, on which occasions some of his meals were provided by the caretaker.

Upon the death of Mrs. Harkness in 1905 the decedent was fifty-five years of age. Practically all of his life he had lived in the country, his chief interest, outside of his family, being horses, cattle and sheep. He was devoted to country and out-of-doors life and spent a minimum of time in the city, the testimony all being to the effect that he had a strong dislike for city life. He was not a director of any business corporation and carried on no business, except to look after his investments. He apparently had no city interests and took no part in the social life of New York. The only clubs that he belonged to were those that were conveniences in connection with yachting. He evinced no interest in public affairs and did not even take the trouble to vote. He did, however, take the trouble to swear off any liability for the payment of personal taxes in New York. If he did not adopt New York as his domicile prior to the death of his wife in 1905, considering the previous life of the decedent, his character and interests as portrayed by the evidence, it would require fairly strong proof to show that he adopted New York as a domicile after 1905. Indeed, it is not contended by the Comptroller that there was any definite adoption of a New York domicile after 1905, his contention being that it took place in 1896 when the Fifth avenue residence was first opened for the use of his daughters. Nevertheless, as the Greenwich domicile concededly did not continue after 1907, when he finally sold his place there, and as he had to have some domicile thereafter, it becomes necessary to review his manner of living briefly after the death of his wife. In the winter of 1905-1906 he was in California with his son and a cousin, who from this time until his death was his close companion. The decedent and his cousin spent the summer of 1906 abroad. When he returned in September he went to Walnut Hall where he remained until January, 1907, and then again went to Europe, where he remained until September, 1907, when he returned to Walnut Hall and there remained until December, 1907. He then went on a yachting trip to South America and on his return in March, 1908, after stopping one week at the

Hotel Belmont, New York, he went to Walnut Hall where he remained for two and one-half months. Then he went to Labrador on his yacht and afterwards moose hunting in New Brunswick, returning to Walnut Hall in November, 1908, where he remained until the summer of 1909 except for a week's visit to his daughter in Pittsburgh at Christmas time. In the summer of 1909 he went to Labrador and returned from there to Walnut Hall where he remained for the next eight months. He spent the summer of 1910 in Europe, returning from there to Walnut Hall where he remained continuously for eight months during the winter and spring of 1910–1911. In June, 1911, he went to Europe, returning to Walnut Hall in August, where he remained for three months and then in December, 1911, after stopping a few days at the Hotel St. Regis in New York, he again sailed for Europe. He returned to Walnut Hall in March, 1912, and remained there for a period of nineteen months except for a few days spent at the Waldorf-Astoria Hotel in New York where he stopped on landing from the ocean voyage. In November, 1913, he went to his younger daughter's home in California, remaining there until April, 1914, when he returned to Walnut Hall for three months. In July, 1914, he visited his elder daughter at her summer cottage at Easthampton, L. I., and remained there until September, purchasing a place where he intended to establish a summer home near his daughter's place. He returned to Walnut Hall for two months, stopping over at his son's home in New York for a few days *en route*, and in November went to his younger daughter's ranch at Paicines, Cal., where he died on January 17, 1915. Upon this evidence the conclusion is irresistible to my mind that the Comptroller wholly failed to establish any intention on the part of the decedent to abandon his Greenwich domicile and adopt New York in its place; and further that when the Greenwich domicile was abandoned after the death of his wife in 1905, as between New York, where he spent practically no time and had nothing but a boarded-up house in the hands of a caretaker for sale, and Kentucky, where he spent practically all of his time when in this country, where he maintained a permanent home, where all of his personal belongings were and all of his interests were centered, it must be said that the

First Department, May, 1918.      [Vol. 183.

evidence overwhelmingly preponderates in favor of Kentucky as his domicile of choice.

Nevertheless, counsel for the State Comptroller has by dint of great industry produced a number of items of evidence, consisting of declarations and bits of evidence claimed to have the force of declarations, from which the court is asked to draw the inference that decedent abandoned his Greenwich domicile in favor of New York, and that, in any event, Kentucky was not shown to be his domicile of choice at the time of his death. Great stress is laid upon the alleged testimony of decedent's daughter, Mrs. Edwards, that the household was removed from Greenwich to New York. A quotation from the record shows the extent to which counsel goes in attempting to build up his case. Mrs. Edwards was examined by counsel for the administrators as follows: " Q. And do you remember any removal of the household from Greenwich, Connecticut, to anywhere else? A. Well, later? Q. Yes. Where did you go? A. To New York. Q. And where did you go, did you go then to Kentucky, to Walnut Hall? A. Yes." This is a very slender basis for the Comptroller's conclusion. The meaning of the witness is perfectly apparent. The servants and the household menage were transferred to the New York house for two winters and back again in the summer, but bringing them to New York for the winter is no more evidence of decedent's intention to change his domicile from Greenwich to New York than was their transfer back to Greenwich in the summer evidence of an intent to change his domicile back from New York to Greenwich. As has been shown, Greenwich continued to be occupied just as theretofore for eight years after this alleged " removal." There are in evidence the marriage certificates of his two daughters signed by the decedent as witness, one dated 1898, the other 1899, in which the residence of the daughters is said to be 933 Fifth avenue, New York city. But these were the statements of the daughters, and even if their declarations, made under such circumstances, were called to the attention of the decedent, of which there is no evidence, they were merely statements of residence which were entirely correct and quite natural in view of the use made by the daughters of the town house for social affairs, and were not in any sense persuasive proof of the domiciliary

intent of the decedent. Furthermore, they were made at a time when the only occupation of the town house by the decedent had been for about two and one-half weeks at the time of the Christmas holidays in 1896–1897 and in 1897–1898. And so far as attaching weight to these certificates as declarations, they are completely nullified by subsequent declarations directly to the contrary in an affidavit filed with the building department of the city of New York in 1899 in which the decedent declared that he was a resident of Greenwich, Conn. Stress is laid upon decedent's selection of Woodlawn Cemetery for a family mausoleum and the burial there of his wife. But this is just as consistent with domicile at Greenwich as with domicile in New York city. Considerable stress is laid upon a statement in an affdavit filed with the building department in the city of New York in 1896, in which the decedent is described as a resident of New York in a routine application referring to proposed alterations in the New York house. This only shows how little weight is to be attached to declarations, as against acts constituting the conduct and manner of life, from which intent is much more certainly inferred, for at the time this affidavit was made the decedent was manifestly domiciled in Greenwich and had no dwelling in the city of New York where his house was not then finished and had not been opened. Such force, if any, as may be attached to this affidavit is destroyed by a similar affidavit, above referred to, made three years later, in which he described himself as a resident of Greenwich. A card at the Garfield Bank in New York city in 1901 giving decedent's residence at 933 Fifth avenue, New York city, is in evidence. The handwriting is not that of the decedent; it is a statement of residence, and not domicile, made at a time when the decedent had three residences; and it is flatly contradicted by the direct statement in an affidavit filed with the tax department in New York city in 1910 in which decedent swore that he had not been " during twelve years last past, a resident of or domiciled in the city, county or State of New York," which covers the period antedating the card in the bank. Further, the decedent's address as a stockholder, on the books of the same bank, was Kentucky. A lease of a safe deposit box in New York city giving decedent's address as 933 Fifth avenue in

1903 is in evidence.   This is of very slight force, for even if the address was called to his attention, of which there is no evidence, and which, as such things go, is quite unlikely, the address was entirely correct, and would have been equally correct if it had stated either Donerail, Ky., or Greenwich, Conn.; but with three residences, the statement of decedent's address at one of them, prepared by another person, is no proof of the decedent's domiciliary intent.   Further, it is contradicted by the tax affidavit of 1910.   An application for membership in the New York Yacht Club dated May, 1904, signed by decedent's half-brother, is in evidence.   This is no statement by decedent, and, even if it were, it would be entirely natural for a man having three addresses in three different States to give his New York address in applying for membership in a New York club.   This, too, was the year when decedent gave strong evidence of his intention to retain his established domicile at Greenwich, by tearing down his house there and having plans made for a new one.   Similarly as to an application for membership in the Columbia Yacht Club in New York city dated 1904, a club which he joined for the convenience of its Hudson river boat landing.

The declarations above referred to are the only ones bearing upon the period of the alleged abandonment of Greenwich in favor of New York and are wholly insufficient in probative force, quite irrespective of the evidence adduced by the administrators to the contrary.

As it is the Comptroller's contention that the decedent abandoned his Greenwich domicile for New York prior to the death of his wife in 1905, and as there is absolutely nothing in the life of the decedent after that time which indicates the slightest intention of his taking up either a residence or domicile in the city of New York, any declarations subsequent to 1905, referring to decedent as a resident of New York, are of little moment.   The only circumstance that entitles them to consideration is that decedent undoubtedly abandoned his Greenwich domicile after the death of his wife, and as there is some evidence, in the shape of declarations, tending to show that he did not adopt Kentucky as his domicile, it is open to the Comptroller to claim the benefit of declarations in favor of New York.   The strongest evidence

on this head introduced by the Comptroller is an application for a passport signed by the decedent in France in 1907 in which he stated: "My permanent residence is in N. Y." As a declaration, this is very persuasive, for there was no motive for making an incorrect statement, as might be the case in applications to get rid of payment of taxes. As a declaration, it has further weight in view of an affidavit swearing off taxes, verified in 1910, wherein decedent swore that he was "temporarily sojourning in Kentucky." But as a declaration, it is weakened by subsequent declarations, for in the tax affidavit of 1910 the decedent swore that he had not had a residence in New York for twelve years and that his domicile was in California; and in 1912 he similarly made an affidavit against domicile or residence in New York for a period of eight years and claimed California as his domicile. These conflicting declarations afford another illustration of the weakness of declarations as against what may be called the acts of the decedent, going to make up the manner and conduct of his life. Following the statement of the rule in the leading case of *Dupuy* v. *Wurtz* (*supra*), this court has repeatedly disregarded declarations when they conflict with acts, which are more persuasive in showing intent.

In *Matter of Morgan* (176 App. Div. 909) the court held that the decedent was domiciled in New York at her death in August, 1913. She had made the following declarations:

1. In 1903: (a) Decedent brought an action in the Supreme Court in New York county, for an accounting and for appointment of new trustees under her husband's will, and in the verified complaint, she alleged: "The reason why the plaintiff, Carolyn F. Morgan, desires to resign is that she is a resident of the City of Washington, in the District of Columbia;" (b) in the same action she signed and acknowledged an instrument of resignation in which she asked leave to resign as trustee "on the ground that I am no longer a resident of the State of New York, but reside in the City of Washington, in the District of Columbia;" (c) the referee reported that the decedent was a resident of the city of Washington, in the District of Columbia. 2. In 1905: (a) In a deed signed and acknowledged by decedent she is described as a resident of Washington; (b) she is so described in a contract: (c) she

is so described in a mortgage. The foregoing declarations were made prior to the death of decedent's husband. 3. In 1907: (a) In two deeds the decedent as grantee is described as a resident of Washington; (b) she is so described in a mortgage executed and acknowledged by her. 4. In 1909: (a) The decedent, the mortgagee, is described as a resident of Washington in two mortgages; (b) she is so described in two deeds; (c) she is so described in a deed to her as grantee. 5. In 1910: (a) The decedent as grantee is described as a resident of Washington in a deed. 6. In 1913: (a) Decedent as lessor is described as a resident of Washington in a lease; (b) she is so described in an agreement signed and acknowledged by her.

In *United States Trust Company* v. *Hart* (150 App. Div. 413, 417) the court said: " One's acts are always much more satisfactory as evidence of intention than his declarations, and written declarations are considered stronger than oral ones." (See, also, *Matter of Mesa y Hernandez*, 172 App. Div. 467; *Matter of Newcomb, supra.*) A striking illustration of the same principle was afforded by the California Supreme Court in dealing with the domicile of this decedent. There the court had presented to it the two affidavits above referred to, dated 1910 and 1912 respectively, in which the decedent swore that his domicile was in the State of California. Yet the California court, although these declarations could have been considered as, to some extent, fortified by the length of time that the decedent had spent in California and by the fact that he died there and made an income tax return there, was broad enough to brush these declarations aside in favor of the intent to make Kentucky his domicile during the latter years of his life, which was so much more forcefully shown by his acts, as opposed to declarations. So, here, the declarations above considered, and such additional items as an occasional hotel registration when passing through the city of New York, and the fact that some deeds to real estate described the decedent as of the State of New York while others gave his residence as in Kentucky, all contradictory and lacking strong probative force, must give way before the plain inference to be drawn from the decedent's manner of life, his character, and his interests, all of which lead irre-

sistibly to the conclusion that, while living in the east down to the death of his wife, his domicile was in Greenwich and thereafter at Walnut Hall in Kentucky. This conclusion is reached without even drawing upon the evidence of declarations introduced from many sources by the administrators. The testimony on the side of the administrators strongly fortifies their contention, and it should be said in passing that the intemperate characterization of the testimony of the decedent's son and daughter, indulged in by the counsel for the Comptroller, is entirely unwarranted, and not excusable even in the heat of partisan argument. However tempting it may be, from the standpoint of the State of New York, to seize upon this great property for the purpose of taxation, the controversy must be decided fairly and strictly according to the evidence. Reviewing the evidence in this spirit, I can reach no other conclusion than that the decedent was not at the time of his death domiciled in the State of New York.

It follows, therefore, that the order of the surrogate must be reversed, with costs, with direction that the proceeding be remitted to the transfer tax appraiser for the purpose of appraising the estate of the decedent as a non-resident of this State.

CLARKE, P. J., LAUGHLIN, DOWLING and PAGE, JJ., concurred.

Order reversed, with ten dollars costs and disbursements, and proceedings remitted as stated in opinion.