In the Matter of the Petition of LELIA B. BENNETT for a Decree Revoking the Letters of Administration Granted Herein to NANNIE B. ANDERSON in the Estate of ISAAC BENNETT, Deceased.

Surrogate's Court, Kings County, December 30, 1929.

487

*Griggs & Flagg*, for the petitioner.

*Perry & Lehrman*, for the respondent.

WINGATE, S. The problem presently propounded arises upon the return of an order directing the administratrix heretofore appointed to show cause why her letters should not be revoked because of a false suggestion of a material fact in her petition for administration.

The petition in question was filed in this court on March 14, 1929. It recites that the petitioner is one of the daughters of the decedent and " that the said deceased resided at the time of his death at No. 306 Wyckoff street, Brooklyn, N. Y., and died at Methodist Episcopal Hospital on the 5th day of March, 1929."

The only next of kin are therein stated to be the petitioner and another daughter, Ethel Holmes, whose consent to the grant of letters was filed with the petition.

The petition for removal of the administratrix alleges that the petitioner is the widow of the deceased. This allegation is denied. The defense set up in the answer is that on or about November 10, 1928, the decedent obtained an absolute divorce from her in the Corporation Court of Danville, Va.

The effect of this decree of divorce, which was unquestionably entered, is the crux of this controversy.

A considerable number of the pertinent allegations of the petition are admitted by failure to deny. Certain of these, however, are contradicted by the unimpeached testimony adduced at the hearing,

without objection. In so far as this is the case, the testimony is entitled to the greater credence. As derived from these two sources, a composite picture of the relevant relations of the parties is as follows:

Petitioner and decedent intermarried at Danville, Va., on May 16, 1892. Two children were born to them, one of whom died, and the other is the Ethel Holmes mentioned in the petition for administration. After their marriage they continued to reside in Danville for about six or seven years and then moved to Staten Island, N. Y., where they lived for about three years. They then moved to Hartford, Conn., where they stayed for about four years and then went to Newark, N. J. There the petitioner and decedent lived together for about five years, and up to the year 1909, when the petitioner left her husband and went to live in Manhattan and never lived with him thereafter, although she occasionally visited him. In 1912 the decedent moved to the top floor of 306 Wyckoff street, Brooklyn, where he resided up to the time of his death in 1929.

On August 10, 1929, the decedent instituted an action for absolute divorce against petitioner in the Corporation Court of Danville, State of Virginia, on the grounds of desertion and abandonment. On his allegation that she was a non-resident of Virginia and that her last known place of abode was 902 Clifton place, Brooklyn, N. Y., an order for her service by publication was entered and such publication was made. A certificate of the clerk of the Virginia court further shows:

" *First*. That Isaac Bennett, the plaintiff in the above styled suit appeared before Harry Wooding, Jr., a Notary Public, and made oath that Lelia B. Bennett, defendant in said suit, was a non-resident of the State of Virginia, and that her last known place of abode or address, is 902 Clifton Place, Brooklyn, N. Y.

" *Second*. That upon said affidavit, an Order of Publication was issued and on the 10th day of August, 1928, a copy of said Order of Publication was mailed to Lelia B. Bennett, defendant, addressed to her at 902 Clifton Place, Brooklyn, N. Y., the same address given in said affidavit.

" *Third*. That the Envelop in which said Order of Publication was mailed was returned to the Clerk of said Court the sender, marked under reason for non-delivery, ' *no such number*.' "

In spite of this, a decree of absolute divorce *a vinculo* was entered in favor of the decedent on November 9, 1928. The petitioner herein did not appear in the action, and the record is barren of any showing that she had any notice of the pendency of the action, except such as may be imputed to a resident of New York city

as a result of four notices published in the Danville, Va., *Evening Bee.*

A further illuminating circumstance bearing on the *bona fides* of this divorce action is found in a comparison of the " sixth " paragraph of decedent's complaint in the action, and the record of his deposits in his savings account No. 100,924 in the Forty-second Street branch of the National City Bank of New York.

He states in his petition filed on or about August 10, 1928: " That your complainant has resided and has been domiciled in this State and is now domiciled in and is and has been an actual *bona fide* resident of the City of Danville, Virginia, for more than one year next preceding the institution of this suit."

His New York city savings account shows fifty-two different deposits of two dollars each between August 8, 1927, and August 13, 1928, at regular intervals, approximately a week apart.

Practically all of the witnesses on both sides, one of whom was decedent's housekeeper, testified to long, and in many cases intimate, acquaintance with the deceased in Brooklyn over periods of years, but the court listened in vain for any intimation of absence by the deceased from his residence on Wyckoff street during the approximately seventeen years that he lived there.

A certificate from the board of elections of the city of New York, introduced in evidence, showed that he registered from the Wyckoff street address in the election of 1925 and voted ballot 13, and indicated that he also registered in 1924.

A statement to the Equitable Life Assurance Society, signed by decedent on November 29, 1919, in connection with group insurance, read: " My residence is 306 Wyckoff St., Brooklyn, Kings County, N. Y."

Several of the witnesses for the respondent testified to statements made by the decedent to the effect that his home was in the south and that Brooklyn was merely his temporary residence, but the time of such declarations does not clearly appear, and in one instance, at least, it was reasonably apparent that the statement was coupled with remarks about his pending divorce.

The last fact which seems worthy of note is that at his death, and for some time previous, the decedent had been making weekly payments to the petitioner pursuant to an order of the New York Family Court.

The problems of conflict of laws, domicile, jurisdiction and constitutional law involved in the facts reviewed have agitated legal circles since the founding of the republic, but the assistance afforded by counsel in this controversy toward their present solution has been negligible. Petitioner has submitted no memorandum what-

soever, while respondent was content to cite article 4, section 1, of the Federal Constitution, to give quotations of language from three cases which are quite beside the point and to refer to the familiar decision of *Atherton* v. *Atherton* (181 U. S. 155), which is of doubtful application.

The policy of the State of New York respecting foreign divorces affecting its citizens was early enunciated and has been consistently followed. Its first clear expression is found in *People* v. *Baker* (76 N. Y. 78) in which the court says (at p. 88): " The policy of this State always has been that there may of right be but one sufficient cause for a divorce *a vinculo;* and that policy has been upheld, with strenuous effort, against persistent struggles of individuals to vitiate and change it. And although it is lightly, we must think, sometimes said that it is but a technicality, that there must be personal notice and chance to be heard, to make a valid judgment affecting personal rights and conditions, we cannot but estimate the principle as of too fundamental and of too grave importance, not to be shielded by the judiciary, as often as it is in peril."

This fundamental policy was again adverted to in *Hubbard* v. *Hubbard* (228 N. Y. 81), where the court says (at p. 85):

" The reason for the stated policy of this state is its statutory adoption of the rule that there may be of right but one sufficient cause, to wit, adultery, for absolute divorce. \* \* \*

" The policy of this state is not embodied in any legislative enactment or is not a rule of universal law. It exists to promote the permanency of the marriage contracts and the morality of the citizens of the state. Whether or not the operation of a foreign decree of divorce in a given case will contravene the policy or wrong or injure citizens of the state is exclusively for its courts to determine."

That this principle of New York policy is well recognized is evidenced by the comprehensive review given this question by the United States Supreme Court in *Haddock* v. *Haddock* (201 U. S. 562, at p. 587).

In view of our Federal form of government, the ability of our courts to effectuate this policy is limited by the terms of the Constitution of the United States, as is pointed out in *Beeck* v. *Beeck* (211 App. Div. 720, 725): " It has been the established policy of the courts of this State to disregard decrees of absolute divorce of foreign jurisdictions, granted for causes other than adultery, when it has been possible so to do, without disregarding the provisions of the Federal Constitution."

The pertinent provision of the Federal Constitution in this

connection is section 1 of article 4, which reads as follows: " Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State   *   *   *."

As the proper interpretation of this provision is primarily a Federal question, the determinations of the United States Supreme Court are controlling on the subject. As a result of such decisions, the general considerations pertinent in the present proceeding are clearly defined.

The court in discussing this clause in *Wisconsin* v. *Pelican Insurance Co.* (127 U. S. 265) said (at p. 291): " These provisions establish a rule of evidence rather than of jurisdiction. While they make the record of a judgment, rendered after due notice in one State, conclusive evidence in the courts of another State, or of the United States, of the matter adjudged, they do not, affect the jurisdiction, either of the court in which the judgment is rendered or of the court in which it is offered in evidence. Judgments recovered in one State of the Union, when proved in the courts of another government, whether state or national, within the United States, differ from judgments recovered in a foreign country in no other respect than in not being re-examinable on their merits nor impeachable for fraud in obtaining them, if rendered by a court having jurisdiction of the cause and of the parties. *Hanley* v. *Donoghue,* 116 U. S. 1, 4."

It must follow as a natural corollary that if in any case the court rendering the judgment did not have jurisdiction to determine the question decided, its pronouncement would not be entitled to the protection of the full faith and credit clause of the Constitution and would, therefore, be subject to collateral attack, and such has been the uniform course of decision. (*Bell* v. *Bell,* 181 U. S. 175, 177; *Rose* v. *Himely,* 4 Cranch, 241, 269; *Thompson* v. *Whitman,* 18 Wall. 457, 469; *German Savings & Loan Society* v. *Dormitzer,* 192 U. S. 125, 128; *Haddock* v. *Haddock,* 201 id. 562, 567; *Pennoyer* v. *Neff,* 95 id. 714, 734; *Hall* v. *Hall,* 139 App. Div. 120, 124; *White* v. *Glover,* 138 id. 797, 799; *Hunt* v. *Hunt,* 72 N. Y. 217, 225; *Andrews* v. *Andrews,* 188 U. S. 14.) In the last cited case the court says (at p. 37): " As the State of Massachusetts had exclusive jurisdiction over its citizens concerning the marriage tie and its dissolution, and consequently the authority to prohibit them from perpetrating a fraud upon the law of their domicile by temporarily sojourning in another State, and there, without acquiring a *bona fide* domicile, procuring a decree of divorce, it follows that the South Dakota decree relied upon was rendered by a court without jurisdiction, and hence the due faith and credit clause of the Constitution of the United States did not require the enforce-

ment of such decree in the State of Massacusetts against the public policy of that State as expressed in its statutes."

Since, therefore, the material matter for determination, where a judgment of a court of another State is questioned, is whether or not such court had jurisdiction, it is obvious that any recitals of facts in the judgment or decree under examination, assuming or tending to show jurisdiction, are subject to examination and may be controverted. (*Thompson* v. *Whitman*, 18 Wall. 457; *Bell* v. *Bell*, 181 U. S. 175, 177; *German Savings & Loan Society* v. *Dormitzer*, 192 id. 125, 128).

Having reached the point that any judgment rendered by a court not having jurisdiction is not within the protection of the Constitution and that any pertinent fact bearing upon such jurisdiction may be shown, we next approach the more difficult question of when the courts have such essential power, viewing the question purely from its interstate aspect.

It is, of course, fundamental that for a court to have jurisdiction of an ordinary action *in personam*, the defendant must have been personally served in the action, within the territorial limits of the sovereignty (*Pennoyer* v. *Neff*, 95 U. S. 714; *Haddock* v. *Haddock*, 201 id. 562, 567); but in an action *in rem* such personal service need not be effected upon the owner of the *res*, provided the *res* itself is within the reach of the court's process. (*Pennoyer* v. *Neff*, *supra; Haddock* v. *Haddock*, 201 U. S. 562, 569.)

The subject of jurisdiction in divorce proceedings is *sui generis* and partakes of the characteristics both of actions *in personam* and actions *in rem*, more closely resembling the latter than the former.

A review of some of the leading cases will prove of value in this connection.

In *Cheeley* v. *Clayton* (110 U. S. 701) the parties, although married outside the State, later lived in Colorado as man and wife. The wife left her husband and he obtained a divorce for abandonment. It was held (p. 705) that the situs of the marital relation was Colorado, that its courts had jurisdiction and that the laws of the place of marriage were immaterial.

The opposite extreme is shown in the cases of *Bell* v. *Bell* (181 U. S. 175) and *Andrews* v. *Andrews* (188 id. 14). In the former the matrimonial domicile was New York and the husband went to Pennsylvania and obtained a divorce, continuing his establishment in New York meanwhile, and returning to New York shortly after the granting of the divorce; in the latter substantially the same facts were present except that the matrimonial domicile was in Massachusetts, while South Dakota was the State of divorce. The *Andrews* case also presented the interesting feature that the wife

appeared in the action and consented to the decree. In both cases it was held that the States granting the divorces had no jurisdiction and that their decrees were consequently not entitled to full faith and credit under the Constitution.

In *Atherton* v. *Atherton* (181 U. S. 155) the matrimonial domicile was Kentucky. The wife returned to her former home in New York following cruel treatment. The Supreme Court held that the Kentucky courts had jurisdiction in the husband's suit for divorce.

On the other hand, *Haddock* v. *Haddock* (201 U. S. 562) held that where the matrimonial domicile was New York, and the husband deserted his wife and went to Connecticut and lived there for a long period of years, the courts of the latter State never acquired jurisdiction over the matrimonial status.

The basic principle underlying the entire subject is that only one State has jurisdiction as of right, as distinguished from jurisdiction as a matter of comity. Such State is the one in which the matrimonial domicile exists or would exist, except for the legally unjustifiable act of one of the parties to the matrimonial relation. Obviously, from the nature of marriage, this status, or, to coin an expression, *quasi-res*, cannot exist separate and apart from both of the parties to the marriage. On the other hand, since in legal contemplation the husband is the head of the family as a result of the obligation of support which the law imposes upon him, the situs of the *quasi-res* may exist within a jurisdiction in which the husband is domiciled and is maintaining or is prepared in good faith to maintain a joint family residence, in spite of the absence of the wife from such jurisdiction.

All of the leading adjudications are clearly reconcilable on this basis with the following results:

1. A State has jurisdiction if husband and wife are both domiciled within it. (*Cheeley* v. *Clayton*, 110 U. S. 701.)

2. No State in which petitioner is not validly domiciled has jurisdiction. (*Bell* v. *Bell*, 181 U. S. 175, 177, 178; *Andrews* v. *Andrews*, 188 id. 14, 41.)

3. A State in which the husband is validly domiciled has jurisdiction in the absence of the wife, if her absence is legally unjustifiable and in defiance of her marital obligations (*Cheeley* v. *Clayton*, 110 U. S. 701, 705; *Atherton* v. *Atherton*, 181 id. 155; *Haddock* v. *Haddock*, 201 id. 562, 595); and such absence will not be considered justified because it is consequent upon a voluntary separation agreement. (*Barber* v. *Barber*, 21 How. [U. S.] 582, 595; *Haddock* v. *Haddock*, 201 U. S. 562, 571.)

4. A State in which the husband is validly domiciled has no jurisdiction in the absence of the wife, if his absence is legally

unjustifiable and in defiance of his marital obligations. (*Haddock* v. *Haddock*, 201 U. S. 562; *Barber* v. *Barber*, 21 How. [U. S.] 582, 595.)

5. These rules are not varied by voluntary appearance or consent of the parties. (*Andrews* v. *Andrews*, 188 U. S. 14, 41.)

It will be obvious from the foregoing that the only instances in which the policy of New York might on any construction run counter to the Federal Constitution, are those in which the valid matrimonial domicile of one of its residents was located in another State. (*Atherton* v. *Atherton*, 181 U. S. 155; *Haddock* v. *Haddock*, 201 id. 562; *Kaiser* v. *Kaiser*, 192 App. Div. 400; affd., 233 N. Y. 524; *Kelsey* v. *Kelsey*, 204 App. Div. 116; affd., 237 N. Y. 520; *Bell* v. *Little*, 204 App. Div. 235; affd., 237 N. Y. 519.)

While the principle has been broadly stated as being based on grounds of public morality and, therefore, to be applicable to all, there is the inherent limitation that where the status of an individual has been validly fixed prior to his coming into this State, our courts will recognize it. (*Hubbard* v. *Hubbard*, 228 N. Y. 81, 85; *Ball* v. *Cross*, 231 id. 329, 331; *Dodge* v. *Campbell*, 128 Misc. 778, 780.) If, however, the status of one becoming a citizen is not definitely determined when he becomes a resident here, the courts in determining the matter will give effect to the settled policy of the State. (*Dean* v. *Dean*, 241 N. Y. 240, 242, 243; *Matter of Caltabellotta*, 183 App. Div. 753, 757.)

Since, on the foregoing considerations, the crux of every case involving the question must, in the last analysis, be that of domicile, the considerations affecting this matter will be examined.

The terms " residence " and " domicile," while almost universally used interchangeably in statutes (*Matter of Rooney*, 172 App. Div. 274, 278; *Matter of Norton*, 96 Misc. 152; affd., 175 App. Div. 981; *Matter of Martin*, 173 id. 1, 3; *De Meli* v. *De Meli*, 120 N. Y. 485, 491 · *People* v. *Platt*, 117 id. 159, 167), have in strict terminology variant connotations. While to a degree overlapping, they are by no means equivalent. " Residence " in its strict sense means merely " place of abode." Obviously, any given person may have many such places. No one, however, may have more than one domicile at any given time. (*Matter of Newcomb*, 192 N. Y. 238, 250.) While the general concept of domicile is extremely common in law, its exact definition to the satisfaction of all, has been attempted by many eminent authorities with only partial success. The statement which has met with the most general favor is that of Justice STORY, which reads: " In a strict legal sense that is properly the domicile of a person where he has his true, fixed, permanent house and principal establishment and to which, whenever he is

absent, he has the intention of returning." (Story Conflict of Laws [8th ed.], 41.)

It is obvious, whatever definition be adopted, that the intention of the individual is a decisive factor in the determination of whether any particular residence which he may occupy is his domicile. " The question is one of fact rather than law, and it frequently depends upon a variety of circumstances, which differ as widely as the peculiarities of individuals." (*Matter of Newcomb*, 192 N. Y. 238, 250.) In consequence of this, precedents are of slight assistance. ( *U. S. Trust Co.* v. *Hart*, 150 App. Div. 413, 415; modified, 208 N. Y. 617; *Dupuy* v. *Wurtz*, 53 id. 556, 562.) In the last analysis the determination must be based not on " a mere arbitrary declaration on the part of the individual, but is to be gathered from his conduct as evidenced by his daily life; " and " his relation to the premises." (*Matter of Rooney*, 172 App. Div. 274, 277.) In this connection " his acts and conduct are more important than declarations, either written or oral." (*Matter of Harkness*, 183 App. Div. 396, 397; *Matter of Newcomb*, 192 N. Y. 238, 251; *Plant* v. *Harrison*, 36 Misc. 649, 669; *Dupuy* v. *Wurtz*, 53 N. Y. 556, 562; *Matter of Paris*, 107 Misc. 463, 469.) " A temporary residence for a temporary purpose, with intent to return to the old home when that purpose has been accomplished, leaves the domicile unchanged, but even if the residence was begun for a temporary purpose, intention may convert it into a domicile." (*Matter of Newcomb*, 192 N. Y. 238, 251.) " The English rule that the domicile of origin reverts at once upon the abandonment of the domicile of choice * * * has not been followed in this country where the rule seems to be that a domicile once acquired continues not only until it is abandoned but until another is acquired. Jacobs Domicil, section 114." (*Plant* v. *Harrison*, 36 Misc. 649, 655; *Smith* v. *R. B. I. Building Corp.*, 126 id. 826, 828.)

Applying these principles to the facts relating to the decedent in this case, it cannot be open to serious question that during his sixteen years of residence at 306 Wyckoff street, Brooklyn, prior to the filing of his petition for divorce in Virginia, the decedent became validly domiciled in the State of New York. The exact time when such domiciliation took place is undeterminable and immaterial. It certainly occurred prior to his registry and vote in 1925. It may well be doubted, in view of the previous history of the decedent, that he became domiciled in New York immediately upon his leaving New Jersey, but when it became apparent that his New York employment by the Pittsburgh Plate Glass Company could be considered permanent, the court feels that it should be held that his domicile became fixed.

In view of this determination, it is obvious that the situs of the matrimonial domicile became fixed in New York in view of the principle that the domicile of the wife in cases of her abandonment of the husband follows his. (*Matter of Newcomb*, 192 N. Y. 238, 251; *Cheeley* v. *Clayton*, 110 U. S. 701, 705; *Barber* v. *Barber*, 21 How. [U. S.] 582, 595; *Cheever* v. *Wilson*, 9 Wall. 108, 123; *Haddock* v. *Haddock*, 201 U. S. 562, 571.)

It follows that as the decedent was domiciled in New York on November 10, 1928, the decree of divorce granted him on that date by the Virginia court was void and not entitled to receive faith or credit in the courts of this State, and, being contrary to the established policy of this State, will be given no effect. Finally, that the petitioner herein being the lawful widow of the decedent is entitled to administration upon his estate. (Surr. Ct. Act, § 118.)

One further consideration is worthy of passing note, namely, that if the court were to determine that the divorce in the instant case was valid, this determination would also necessarily require a revocation of the letters of administration heretofore granted to Nannie B. Anderson. The situation of deceased, so far as domicile was concerned, was precisely the same on March 5, 1929, the date of his death, as it was three months and twenty-five days previous, when this divorce was granted to him. If the divorce on November 10, 1928, was valid, he was domiciled in Virginia on that date, and must be held to have continued such domicile to the time of his death. (*Matter of Newcomb, supra; Smith* v. *R. B. I. Building Corp.*, 126 Misc. 826, 828.) From this it would follow that the courts of New York would have no original power of administration over his estate (*Bolton* v. *Schriever*, 135 N. Y. 65, 69; *Dupuy* v. *Wurtz*, 53 id. 556, 560), and that administration having been obtained by a false suggestion of a material fact in the petition that decedent " resided," which term in this connection means " domiciled," in New York (*Matter of Rooney*, 172 App. Div. 274, 278; *Matter of Norton*, 96 Misc. 152; affd., 175 App. Div. 981; *Matter of Martin*, 173 id. 1, 3; *DeMeli* v. *DeMeli*, 120 N. Y. 485, 491), the letters of administration must be revoked for want of jurisdiction.

Were it of sufficient importance to warrant the effort, it might be an interesting subject of inquiry to determine whether, in view of this allegation of her petition, the administratrix is not estopped to assert these facts which would destroy the jurisdiction which she, herself, invoked, and, further, whether such assertion is not a collateral attack upon the decree of this court granting administration within the inhibition of section 43 of the Surrogate's Court

Act. (See *Bolton* v. *Schriever*, 135 N. Y. 65, 68, 70, 71; *Webster* v. *Kellogg Co.*, 168 App. Div. 443, 444.)

The further attack made in the instant petition on the relationship of Mrs. Anderson to the decedent, is not worthy of serious consideration. All of the evidence adduced demonstrates that the recognized relationship of parent and child existed between them and under such circumstances the burden is upon the person denying the relationship to show by "irrefragable proof" that it did not exist. (See *Hynes* v. *McDermott*, 91 N. Y. 451; *Caujolle* v. *Ferrie*, 23 id. 90; *Mayer* v. *Davis*, 122 App. Div. 393; *Matter of Findlay*, 226 id. 638.)

It follows that the grant of administration to Nannie B. Anderson must be revoked and that Lelia B. Bennett, upon duly qualifying according to law, will be appointed in her stead and that Nannie B. Anderson must account within thirty days.

Enter decision and decree, on notice, accordingly.