In the Matter of the Estate of LOUIS CHERNEY, Deceased.

Surrogate's Court, Kings County, April 30, 1937.

*Bernard W. Goldenberg*, for the petitioner Zibia Ogrodink, daughter of decedent.

*Leo Pincus*, for Bessie Cherney, respondent.

*John J. Rooney*, special guardian for Ida Cherney, incompetent daughter.

WINGATE, S. The present controversy respecting priority of right to intestate administration upon the estate of this decedent makes an attack upon the status as such of the person whom the decedent had unquestionably deemed to be his lawful wife for a decade or more, who had shared his joys and sorrows, participated in his success and adversity and assisted in the care and upbringing of his children by his former marriage.

The decedent was an orthodox Jew, born in Russia, where he was married to one Leah. He immigrated to this country in or about the year 1905 and his wife followed him about a year later. For a time they lived together in various places in New York and Connecticut but separated sometime in the early 1920s. Attempt was made to prove the grant of a rabbinical divorce purporting to dissolve this marriage, but the court was forced to exclude the document from the record by reason of its insufficient identification.

In any event, the court is satisfied by the proofs that in or about the year 1923 the decedent was married in the Jewish faith to Bessie Simon Melsky, who was a widow with a daughter of about ten years of age, and who is the present alleged widow whose status as such is now questioned. They established a domicile, apparently matrimonial, at 50 Graham avenue, Brooklyn, the members of the household consisting of the decedent, his new " wife " and the daughter of the latter to whom the decedent was introduced as her stepfather, and whose subsequent relations with her appear to have been those of an actual affectionate father. About a month after their establishment of this residence, Bella and Frieda, two of the decedent's children by Leah, came to live with them and became regular members of the household and were cared for by the respondent as her own children. They attended school from this home and were washed, clothed and nursed in illness by her. When Frieda married, her wedding reception was arranged and conducted by the respondent at the home of the parties. For various periods, Harry, another of decedent's children by Leah, also lived in the household and Zibia, another child, visited them but did not reside there. From time to time the household was moved to different addresses, but at all of these the relations of the parties remained the same. A formidable array of witnesses was introduced whose testimony demonstrates that at all times from the first establishment of their joint residence, the decedent invariably introduced and referred to the respondent as " Mrs. Cherney " and " my wife " not only to tradesmen and others with whom they had business and household dealings but to friends and acquaintances, and that they, in all respects, lived together in the normal relation of husband and wife.

In or about the year 1927 the decedent began to entertain doubts as to the legality of his marriage to the respondent and thereupon went to Reno, Nev., and was awarded a divorce from Leah by the courts of that State. Admittedly Leah was not personally served and did not appear in that action and the residence of the decedent in Nevada was purely for divorce purposes, wherefore the decree must be deemed void for want of jurisdiction. (*Bell* v. *Bell*, 181 U. S. 175, 177, 178; *Andrews* v. *Andrews*, 188 id. 14, 41; *Olmsted* v. *Olmsted*, 190 N. Y. 458, 466; *Matter of Bennett*, 135 Misc. 486, 493, 494.)

After securing this decree, the decedent and the respondent went to Norristown, Pa., where on October 21, 1927, they were again ceremonially married. They thereupon returned to New York city and resumed the relations and mode of life which have been described. They thus continued up to the date of the decedent's death on October 4, 1936.

Unquestionably, the rabbinical divorce of the decedent from Leah, if one was actually pronounced, was wholly void (*Chertok* v. *Chertok*, 208 App. Div. 161, 162; *Matter of Goldman*, 156 Misc. 817, 819), with the result that the subsequent rabbinical marriage between the decedent and the respondent was a nullity. Equally unquestionably, the Nevada decree was no more efficacious for the purpose, wherefore the Pennsylvania ceremony did not effect a valid union.

On September 17, 1929, Leah, the decedent's first wife, died. For the succeeding period of more than seven years by which the decedent survived her, his relations with the respondent continued as hereinbefore described. In the interval the Legislature enacted chapter 606 of the Laws of 1933 which provided that " no marriage shall be valid, unless solemnized " in the manner particularly prescribed in section 11 of the Domestic Relations Law and consequently outlawed marriages by mere mutual consent of the parties, familiarly known as common-law marriages. However, for a period of more than three years and seven months succeeding the death of Leah the decedent was free to contract a legal marriage with the respondent, and it is her position that the facts demonstrate that a marriage by mutual consent was actually consummated during that period.

In opposition, the children by the first marriage who are seeking to disinherit her cite the so-called " presumption of law " which is, at best, merely another instance of the inference of fact of the continuance of a condition once shown to exist (*Matter of Callahan*, 142 Misc. 28, 35, 36; affd., 236 App. Div. 814; affd., 262 N. Y. 524), that relationship meretricious in its inception will be deemed to have continued to be of like nature.

This inference of fact looks, however, to the intention of the parties rather than to that description of their acts which the law will apply. Where parties knowingly and intentionally enter into meretricious relations, there arises a natural supposition that, having in the first instance cast aside the usual conventions of society, their attitude in respect thereto will probably continue to be the same unless or until a distinct and unequivocal demonstration of altered attitude is made to appear. Such a situation is not disclosed in the facts of the present case. Here, " as there was a ceremonial marriage service and both parties believed they had a legal right to marry, the relationship was not meretricious in the sense that it was known to the parties to be immoral and unlawful, even if, as a matter of law, it was illegal and void." *(Matter of Crandall,* 214 App. Div. 363, 365.) On the contrary, from the inception of their relations the parties evinced a continuous desire and intention to live as husband and wife, morally and in accordance with socially accepted standards, as is emphasized by the expense and loss of time involved in the decedent's excursion to Reno to cure, as he thought, the possibility of other than moral and legally recognized relations existing between them.

As is observed in *Matter of Haffner* (254 N. Y. 238, 242, 243): " A common-law marriage is not required to be proved in any particular way. It is sufficient if the evidence establishes that legally competent parties *in præsenti* intended to become husband and wife and thereafter lived and cohabited as husband and wife * * *. The conduct of the parties evidenced their intent to live in lawful wedlock after the impediments to their marriage were removed. Courts should not be solicitous to nullify such intent and decree the relation which they believed lawful to be unlawful and void." To like effect, see *Leeds* v. *Joyce* (202 App. Div. 696, 700; affd., 235 N. Y. 620); *Matter of Wells* (123 App. Div. 79, 85; affd., 194 N. Y. 548); *Tracy* v. *Frey* (95 App. Div. 579, 583); *Taylor* v. *Taylor* (63 id. 231, 234).

In conclusion, this court cannot but adopt the language of Mr. Justice LAZANSKY, now and for many years past, the distinguished presiding justice of the Appellate Division of this department, recorded in his decision at Special Term in *Applegate* v. *Applegate* (118 Misc. 359), which presented a situation bearing striking resemblances to that at bar. This learned jurist there wrote (p. 362): " Although the consent to marriage and the living together up to 1921 came out of a ceremony, in other words, out of an express agreement, these parties always intended to be husband and wife in ignorance of the impediment thereto and regardless of its removal. While it is true that their living together was on the basis of an

express contract which was void and their relationship was intended to continue and their minds only met on that basis, it is nevertheless the fact that they always consented to live together as husband and wife. While that consent had no effect up to the time of the removal of the impediment, it seems to me that after its removal that consent ripened into an effective force. If it cannot be said that consent is implied in fact then it should be implied in law. * * * The law will not be tardy to recognize and sustain a decent relationship * * *. No public policy requires that this defendant be branded as one dishonored."

For the reasons stated, this court accordingly determines that Bessie Cherney became the lawful wife of the decedent immediately following the death of Leah Cherney on September 17, 1929, and is now his widow and entitled to letters of administration on his estate. The petition of Zibia Ogrodink for letters is accordingly denied, with costs of this proceeding, and letters will issue to the widow upon her due qualification according to law.

Enter decree on notice in conformity herewith.