In the Matter of the Estate of JACOB M. EISENBERG, Deceased.

Surrogate's Court, New York County, November 3, 1941.

*Mitchell, Taylor, Capron & Marsh,* for the petitioners.

*Livingston & Livingston,* for Annie Eisenberg, respondent.

*Liebman, Robbins, Pressman & Leider,* for Beth Israel Hospital Association, respondent.

*Stroock & Stroock,* for Montefiore Hospital for Chronic Diseases, respondent.

*Lachman & Goldsmith,* for New York Guild for the Jewish Blind, respondent.

*Morris D. Reiss,* for Jewish Home for Convalescents, respondent.

*John J. Dempsey,* special guardian.

FOLEY, S. In this proceeding the will of Jacob M. Eisenberg, the testator, was offered for probate by two of the three persons named as executors in it. The proponents alleged that the testator was, at the time of his death, a resident of the county of New York.

The question presented for determination is the domicile of the decedent and whether it is in the county of New York or in the State of Florida. It is raised by the answer of Annie Eisenberg, the widow, who asserts in it that her husband was domiciled at his death in Dade county, Fla. She further contends in her answer that the will of the testator has been admitted to probate in that State. She moves for the dismissal of the pending proceeding for original probate in our jurisdiction and asks that ancillary letters of administration with the will annexed be granted to her or her designee.

If the testator died a resident of New York State, the admission of the will in Florida and the determination of its court cannot defeat the jurisdiction of the Surrogate's Court to admit the will here in an original probate proceeding. (*Matter of McCullough,* 129 Misc. 113; *Matter of Rubens,* 195 N. Y. 527, affg. 128 App. Div. 626; *Matter of Hart,* 160 Misc. 198; affd., 250 App. Div. 753; *Matter of James,* 167 Misc. 142; affd., 254 App. Div. 723.)

In proceedings in estates and in related actions, the determination of domicile is presented in varying forms. In certain of them conflict arises between the claims of two States, or sometimes two or more States, over the right to levy an inheritance, succession or estate tax upon the basis of residence of the decedent. (*Texas v. Florida*, 306 U. S. 398; *Matter of Trowbridge*, 266 N. Y. 283; *Dorrance's Estate*, 309 Penn. St. 151; 163 A. 303; *Dorrance v. Thayer-Martin*, 116 N. J. Law, 362; 184 A. 743.) In other phases of the litigation of domicile the dispute arises over diverse property rights between the beneficiaries of the will, or between the legatees and the surviving spouse, as here, or between charities or other persons interested, because of the distinctive and different law of one or other of the States of which the decedent may have died a resident. In these situations, as in the present proceeding, the taxing authorities of the States may not have participated in the litigation. A trust created by the will may be valid in one State and invalid in the other. Charitable gifts may be legal in one jurisdiction and void in the other. The rights of the surviving spouse to elect to take against the will may be greater or less or even non-existent as between the two States.

In the pending proceeding it is undisputed that the controversy has arisen because of the greatly increased rights of the widow under the law of Florida as against the rights granted to her under the law of New York. Under the statute of the former State, Mrs. Eisenberg, the widow, has an absolute right, despite the terms of the will, to take one-third of the personal property of the testator. (Laws of Florida, 1939, chap. 18,999, § 35.) The decedent left no children or descendants. As contrasted with the law of Florida, if Mr. Eisenberg died a resident of the State of New York, the will apparently makes sufficient and ample provision for his widow and she is without any right to take against its terms under the provisions of section 18 of our Decedent Estate Law. The widow thus seeks a determination of domicile in Florida in order to escape her husband's testamentary wish that she be limited to the income of a trust, and in place of it to obtain an outright third of the estate. The legatees resist because the benefits given to them under the will are bound to be substantially reduced by a finding that Florida and not New York was the State of legal residence at death.

Mr. Eisenberg left a gross estate of approximately $1,000,000. In his will he made an outright cash bequest to his widow far in excess of that which section 18 required him to bequeath to her. He created trusts with directions to pay her a substantial income. He made provisions for his blood relations with ultimate outright

gifts to certain of them. He gave legacies to numerous charities. The line of division has thus been drawn between the widow, who under her rights granted to her by the laws of Florida, would take an outright share of the estate approximating $300,000, and the legatees, who under the laws of New York would take the shares given them by the will immune from any attack or diminishment by the widow.

Extensive testimony has been submitted by the contending parties. It consists of the customary evidence in domicile cases bearing upon the life history of the testator, his mode of living in New York, Florida and elsewhere, and his declarations, written and oral, as to his places of residence.

Upon this evidence the surrogate finds that Mr. Eisenberg died a resident of and domiciled in the county and State of New York.

His life history may be divided into four separate periods.

The first period extends from his birth in Russia in 1876 until his arrival in New York county as an immigrant in 1892.

The second period covers a clearly established legal residence in his domicile of choice in New York State of forty-five years from 1892 to 1937. During at least thirty-seven years of this period he was unquestionably domiciled in the county of New York. He married his wife, the respondent here, in New York county in 1902. He established and prospered in a clothing business located in this community. Except for an interruption of two years, in which he lived in Far Rockaway in Queens county, he continued to maintain his home and legal residence at various places in New York county until the month of May, 1931.

In 1929 he had become ill as the result of a serious heart and arterial condition. In the month of May, 1931, he leased and occupied a cottage at Long Beach in Nassau county of this State. During the subsequent years, and including 1937, he resided in the summer months there. During the period from 1930 to 1937 he stayed during the winter months at Miami Beach, Fla. He purchased a parcel of real estate there in 1933 and built a house upon it for occupancy by himself and his wife. He first lived in it in October, 1933. It is claimed by the widow that the testator then changed his domicile from New York to Florida. On the other hand, the surrogate finds that no such change was effectuated at that time or for many years afterward. Upon his own formal declarations and his repeated return to Long Beach in this State for each summer, he continued a legal resident here until late in the year 1937. His sojourns in Florida during these years were motivated by reasons of health and by his physician's advice to avoid the cold winter climate in the north. They were plainly

temporary in character. (*Texas* v. *Florida, supra; Matter of Marks*, 176 Misc. 330.)

The surrogate finds upon the evidence that he was domiciled at Long Beach in this State from 1931 until the latter part of October, 1937  About the year 1934 Mr. Eisenberg developed a scheme to transfer his residence from New York State in order to escape the imposition of income taxes as a resident of our State. He continued to pay his taxes as a resident of this State to and including the year 1934.  For the year 1935 and for each of the following years until the date of his death, his returns were filed as a non-resident of this State.

So far as the evidence discloses, his first non-resident tax return in New York State was prepared and filed early in the year 1936, without consultation with an attorney.  In the prior will executed in 1936 and in the last will here offered for probate, dated October 28, 1937, he had formally stated that he was a resident of Long Beach in this State.  The same attorney drew and was the subscribing witness to each of these two instruments.  He received the instructions as to the contents of the will in preliminary conferences with the testator.  The attorney testified that in one of these conversations, Mr. Eisenberg said that he had filed his returns as a non-resident and that his purpose in doing so was to " evade or avoid " the New York State income taxes.  Mr. Eisenberg then reiterated significantly that he was a resident of the State of New York.  The attorney told him that his attempt to escape the payment of taxes was foolish, that he would get into trouble for it and would involve himself in the long run with the payment not only of these taxes but of penalties and interest.  Mr. Eisenberg's only answer was that he would look into the matter.

The widow has claimed that residence was established in Florida in 1933.  On the other hand, there is convincing evidence in the record that no absolute and unequivocal union of intent and conduct, which are the essential elements of domicile, coincided to effectuate a transfer of his domicile during the period up to the end of October, 1937.  In October, 1935, in a formal proceeding in this court for the probate of the will of his brother, Harry Eisenberg, he stated, under oath, that he was a resident of Long Beach in this State.  In October, 1936, in his petition for naturalization as a citizen of the United States of America, he stated under oath that his place of residence was at 47 Bennett avenue, New York. The continuation of his actual residence in New York State until October, 1937, accompanied by his formal declarations which overcome any conflicting declarations as to residence in Florida, lead to the finding that he was domiciled in this State as late as October, **1937.**

The third period of his activities and declarations then begins. It lasted from early in November, 1937, when he departed for Miami Beach, to the early part of 1940. He had given up his home at Long Beach and had no principal habitation in the State of New York. The furnishings had been shipped to his house at Miami Beach. He lived there continuously until June 20, 1938. Plainly the condition of his health induced him to find other places of stay. For a period of three months in 1938 he was at Asheville, N. C. About the end of September he left for Saratoga Springs, N. Y., where he stayed for approximately one month. He spent a few weeks at a hotel in New York county in October. From November 1, 1938, to January 1, 1939, he was again at his home at Miami Beach. In January, 1939, he went to Tucson, Ariz., and remained there until June first. For a period of some months in the year 1939 he was at Beverly Hills, Cal. He returned to his home at Miami Beach on December 7, 1939.

The surrogate finds that by reason of the abandonment of any place of habitation resembling a home in New York State in November, 1937, and his conduct and declarations as to a Florida residence, Mr. Eisenberg then became domiciled in Florida. (*Texas v. Florida, supra; Matter of Newcomb*, 192 N. Y. 238.) As stated above, he returned to his house at Miami Beach in November of 1937. He had given up his home at Long Beach and maintained no other principal abode in this State. To and including the year 1937 consistent with his scheme to evade payment of taxes wherever possible, whether income taxes in New York as a resident, or intangible personal property taxes in Florida, he made no resident return for the years 1935, 1936 and 1937 in New York and made no returns of intangible personal property in Florida during these years. In fact his accountant in the 1937 return of a closely-held Florida corporation owned by Mr. Eisenberg, described him and his wife as residents of the State of New York. The subsequent letter of the accountant, in which this statement is attempted to be explained, I deem to be a matter of no importance.

The situation had changed, however, in March, 1938, when for the first time he made a return in Florida under the " Intangible Personal Property " tax law and paid such a tax upon the statement that he was a resident of Miami Beach. In this period, his general declarations oral and written as to his residence, while not without conflict, support the conclusion that he was domiciled in Florida until April 14, 1940, when he finally departed from that State.

It was shortly before this date that the fourth and final period of his life began with the change of domicile from Florida back

to New York. It terminated on his death on August 24, 1940. Upon the evidence of acts and declarations of the decedent in this period the surrogate finds that Mr. Eisenberg abandoned his domicile in Florida irrevocably and that he intended to and did re-establish his former domicile in New York county. Again, the original necessity for change from one place to another was dictated by reasons of health and by the orders of his physicians. His determination to surrender his legal residence in Florida is revealed by his letters in evidence. This intent was formulated as early as February 5, 1940, when he wrote to his nephew: " I am sorry to inform you that *I am now fully convinced that I cannot live in Florida,* and the doctors agree with me as I was almost normal when I left California. And from all these indications I will have to leave for the West sooner than I anticipated." (Italics supplied.)

In a second letter, dated the next day, February 6, 1940, he wrote to the same nephew: " I have nothing new to add to my previous letter, excepting that I am sorry to impart to you that Dr. Roche *advised me again to leave Florida as soon as I can,* as the climate does not agree with my blood condition. I am planning on leaving Florida as soon as I can arrange my affairs here." (Italics supplied.) It will be seen from these letters that Mr. Eisenberg fully appreciated the peremptory force of the mandate of his physicians which in effect was, " if you desire to live, you must leave Florida permanently." His plan of abandonment of Florida was promptly executed. His home at Miami Beach was immediately disposed of. The contract of sale of the property was made within a few weeks and on March eleventh. The deed was executed and delivered on April 9, 1940.

On March nineteenth he wrote that he had sold the house " and promised delivery in thirty days, and we expect to leave Miami about the 15th of April. If the weather warms up north I would like to leave earlier." On April fourth he wrote a letter which stated, " This morning we have started to dismantle the house to be placed in storage, as you no doubt know that we have sold the house." On the same day he wrote to another person: " we have started to dismantle the house and place everything in storage as we have to surrender the house on the 11th." The furnishings of the house were stored at Miami Beach, plainly with the intent to ship them north for installation in his permanent home when acquired here.

On April 14, 1940, he and his wife made their final departure from Miami Beach. He went directly to Ann Arbor for the purpose of obtaining medical treatment at a hospital there. In late June he left for Asheville, N. C., again in the hope of a restoration to

health. Shortly after his arrival he was taken to a hospital. He stayed there as a patient until August 4, 1940, when he left for New York city.

Upon his arrival here he went immediately to the Doctors' Hospital where he remained until his death on August 24, 1940. While at Asheville his wife wrote to her brother, who was then living at Long Beach, asking his assistance in finding a suitable house to be rented by the decedent in Long Beach. When his condition became more grave at Asheville the instructions to make a deposit on the proposed lease of such a house were counter-manded by telegram because of the necessity of placing Mr. Eisenberg in a hospital in New York city upon his arrival here.

Plainly the final determination of the decedent was to re-establish New York county as his legal residence. After arrival here, and in the intervening weeks before her husband's death, his wife lived with her sister in an apartment in this county. When he abandoned his domicile in Florida and came to reside in New York county with the demonstrated intention of making that his permanent domicile, he confirmed his purpose to re-establish his legal residence here.

It is argued by counsel for the widow that the letters written by the decedent and quoted from above indicated indefiniteness as to the new place where the testator determined to locate. At the time of the writing of these letters the specific new place of habitation was of no consequence. His subsequent declarations and acts, hereinafter considered, led him to New York county as the selected place of legal residence.

Again the temporary character of the first habitation in this county is of no consequence in view of the combination of necessary intent and actual change of residence. (*Ætna National Bank* v. *Kramer*, 142 App. Div. 444; *Rawstorne* v. *Maguire*, 265 N. Y. 204, 209; *Winans* v. *Winans*, 205 Mass. 388; 91 N. E. 394; *Kennedy* v. *Simmons*, 308 Mass. 431; 32 N. E. [2d] 215.) The legal effect of the permanent abandonment of his home in Florida was to destroy that place as a domicile. (*Texas* v. *Florida, supra; Matter of Trowbridge, supra; Matter of Leidenger*, 173 Misc. 808; *Matter of Benjamin*, 176 id. 518, 527.)

The surrogate finds as a fact that after the abandonment of the Florida domicile, without any intention of returning, Mr. Eisenberg formed the new fixed and certain purpose to take up his domicile with his wife in New York county permanently. In no sense was the purpose inspired by an exclusive desire to obtain medical and hospital treatment here. There is no indication that he was in fear of imminent death. Even during his last stay at

Asheville he transacted important business. Moreover, the temporary character of his wife's living at her sister's home in New York and the husband's entry into the hospital here do not change the permanency of this purpose for the re-establishment of his domicile in New York. He undoubtedly intended to acquire an apartment or a home for occupancy by himself and his wife in this county. The brevity of residence in New York county just before his death is immaterial provided the requisite elements are present.

In *Ætna National Bank* v. *Kramer (supra)* a motion was made to vacate a warrant of attachment. It was claimed that the defendant in the action was a non-resident of the State of New York and resided in New Jersey. It was shown that she had resided in the latter State for many years. A few weeks before her death she left her home there with the intention of taking up her residence in Brooklyn and of abandoning her residence in New Jersey. She selected a house in Brooklyn but stayed at the home of a friend there until her own home could be ready for occupancy. She died in Brooklyn at the house of her friend without ever having occupied her new home. Mr. Justice NATHAN L. MILLER, writing for the First Department, held that there was both a change of residence and an intention to acquire another domicile. He stated: " While the house in which she expected to live was being furnished she remained temporarily in another house in the locality. But we do not consider that fact of any importance. When she abandoned her domicile in New Jersey, and went to reside in Brooklyn, with the intention of making that her permanent domicile, she acquired a domicile there, and the mere fact that her first residence was a temporary one is of no consequence in view of the fact that there was an actual change of residence with the necessary intention of effecting a change of domicile."

In section 16 of the Restatement of the Law, Conflict of Laws, the pertinent rule is defined: " To acquire a domicil of choice in a place, a person must be physically present there; but a home in a particular building is not necessary for the acquisition of a domicil." Two illustrations are given in the comment to the section which are typical and relevant to the general facts in this proceeding: (1) A leaves the State in which he has been domiciled and comes to X, a city in another State, intending to make his home in the city; he lives in temporary lodgings, in hotels and clubs. He is domiciled in X. (2) A leaves the State in which he has been domiciled, and comes to X, another State, intending to make a home in the State as soon as he finds a city therein which pleases him. He lives in hotels in various cities. The owner may be found to be domiciled in X.

Nor was the intention to reside in New York contingent on Mr. Eisenberg finding a suitable place of residence. On the contrary, the finding of a suitable place of residence was rendered necessary by his determination to take up his abode here permanently. A person like Mr. Eisenberg who has come into this county and State for the purpose of residing here permanently while looking around to find a fixed place to live here, " cannot be said to be *in itinere*." A new domicile may be acquired even if the person has not determined in what particular building he will permanently dwell. Nor can the former domicile be said to adhere to him until he has fixed upon a place of habitation in the new place of domicile. (*Winans* v. *Winans, supra.*)

The *Winans* case was followed in a very recent decision in Massachusetts, *Kennedy* v. *Simmons* (*supra*, decided in February of 1941). In many respects the factual circumstances in that case surrounding the change of domicile from Florida to the former domicile in Massachusetts are strikingly similar to the acts and declarations of Mr. Eisenberg in the last few months of his life. The reasons and conclusion of the court are most persuasive here.

The dispute arose as to whether the decedent was domiciled in Florida or in the town of Millis, Mass. He had been originally domiciled in Massachusetts. In 1937 he went to Florida and bought a dwelling there. He resided there during the year 1938. His health had become impaired. He had declared that he was tired of living in Florida. In the latter part of that year he placed his home in Florida on the market for sale. In May, 1939, he resolved to return to Massachusetts. The Florida house was closed. He arrived in Millis, Mass., on July 1, 1939. On July third he was taken to a hospital where he died five days later on July eighth. The opinion of the highest court stated that if the decedent came to Millis for a temporary purpose and, when it was accomplished, he intended to return to Florida and resume his abode there, then his domicile remained in Florida, " but if, on the other hand, while in Millis he intended to make his home there permanently or for an indefinite time and without any fixed or definite purpose to return to Florida, * * * then it could be found that his domicil was in Millis." The circumstance that his death followed shortly after his arrival in Millis was held to be immaterial, if he had formed the necessary intent to make that town his domicile. The finding of fact of the lower court that the decedent intended to make his home in Massachusetts was left undisturbed and his domicile finally determined to be in that State.

The reasons for the final decision of Mr. Eisenberg to return to this county are readily understandable from the facts in evidence. He had been indisputably domiciled in this State for a prior period of forty-five years and in this county for thirty-seven years. In this vicinity lived his close relations and those of his wife. None of them resided in Florida. His charitable donations had been given over a long period of years to religious and philanthropic objects almost exclusively located here. They were continued even while he was a resident of Florida. His gifts to charities there were relatively few and small in amount. He maintained his connection with a synagogue in New York county for a period of twenty-six years to the date of his death. He made his regular financial contributions to it during the entire period. Through it he purchased a plot in Mt. Judah Cemetery, located in New York city. It was acquired in 1914. In 1933 he purchased an adjoining plot. It was his family burial place, for in it were interred his mother, sisters, brothers and other relations. Mr. Eisenberg's remains were buried in that family plot. He was also a member of the congregation of another synagogue in New York county which he joined in 1937, and his membership continued until the time of his death. The annual dues of himself and his wife were regularly paid and substantial additional contributions made to it during the last years of his life and up to within a few months of his death.

Contrasted with these close religious associations with New York county, it is significant that he was not a member of any synagogue in Florida. In his will he gave substantial bequests to thirteen different Hebrew charities engaged in religious, hospital, orphan relief, educational and other worthy philanthropic purposes. Eleven of these legatees were located in New York city, one of them in Denver, Col., and one in Palestine. No provision for any charitable legatees located in Florida was made in the will.

His principal business activities and financial affairs were continued in New York until his death. Through holding corporations he was interested in the ownership and operation of valuable productive real estate in this county. While he made loans on real estate in Florida in substantial amounts, these activities were those of a successful investor who might well have been an undisputed non-resident of that State. His personal bank accounts were maintained in New York county. He had no personal bank account in Florida. His safe deposit box was located to the date of his death in New York county. In it were kept his important financial papers and many of his personal papers. He never had a safe deposit box in Florida.

The proponents have fully sustained the burden placed upon them by law to prove a change of domicile. (*Dupuy* v. *Wurtz*, 53 N. Y. 556; *Matter of Newcomb, supra; Matter of Trowbridge, supra; Ætna National Bank* v. *Kramer, supra*.)

Mr. Eisenberg died a legal resident of the county and State of New York. His will is entitled to be admitted to original and independent probate under the laws of this State.

Complete the necessary proofs as to the execution of the testamentary instrument. Tax costs and submit decree on notice admitting the will to probate and granting letters testamentary to the executors named in it who may qualify.